Per Curiam :
This case was referred pursuant to Buie 45 to Herbert N. Maletz, a trial commissioner of this court, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed May 21, 1963. Plaintiffs filed exceptions to the commissioner’s report and a brief. Defendant filed a notice of election to submit on the commissioner’s report without a brief. The case was submitted to the court on oral argument of counsel. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in the case. Plaintiffs are not entitled to recover and their petition is dismissed.
*314 OPINION OP COMMISSIONER
Plaintiffs, civilian security policemen employed by the Department of the Army at the Frankford Arsenal, Philadelphia, Pennsylvania, bring suit to recover overtime compensation under the Federal Employees Pay Act of 1945, as amended (5 U.S.C. 911).[1] They claim first that they were required to report for work 30 minutes prior to the start of their tour of duty without being paid therefor, and second that they did not have available a 30-minute lunch period as required by regulation, but instead were on duty during that time. Each plaintiff thus seeks overtime pay for 1 hour per day or a total of 5 hours during each workweek of his employment that falls within the six years preceding the filing of the petition on December 29, 1961. Defendant says that plaintiffs worked a total of 8 hours per day for which they have been fully compensated.
The civilian security police force at the Frankford Arsenal was charged with the physical security of the installation and of certain outlying areas. The force was under the supervision of a Provost Marshal and his immediate subordinate, the Security Officer, while its day-to-day operations were directed by a Chief of Police and subordinate shift captains and lieutenants. The policemen operated motor vehicle patrols, manned various posts and gates at the Arsenal proper which covers an area of about 128 acres, and guarded an outpost located some 4 miles away.
Members of the force were employed on the basis of an 8-hour working day, five days per week, but at various times were required to work six days a week for which they received overtime compensation. The force operated around-the-clock on the basis of 3 shifts known as the “A”, “B” and “C” shifts. For the greater part of the claim period, the tour of duty on the A shift was from Y :30 a.m. to 4:00 p.m.; on the B shift from 3:30 p.m. to 12 midnight; and on the C shift from 11:30 p.m. to 8:00 a.m. Each shift overlapped the other by 30 *315 minutes and while the shifts themselves were of 8 y2 hours’ duration, % hour was set aside by regulation for lunch purposes. This overlapping of shifts gave continuity to the entire operation and permitted the policemen to perform certain pre-shift activities during their tour of duty.
Members of the force were required to punch a time clock in police headquarters at the beginning of their tour of duty; i.e., at 7:30 a.m. on the A shift, at 3:30 p.m. on the B shift, and at 11:30 p.m. on the C shift. Immediately thereafter a roll call and inspection were held in the headquarters at which each policeman was required to be in full uniform and to be neat in appearance. In order that he be ready to assume his responsibility immediately, he was also required, pursuant to verbal orders of the shift captains, which were tacitly approved by the Chief of Police, to be armed with his pistol or revolver, together with ammunition therefor. In the event a policeman stood roll call without his side-arm, he was admonished but not marked late. The time required for an entire shift of 20 men to stand in line, turn in their gun chits and draw their weapons and ammunition was not in excess of 5 minutes, with each man needing not more than 15 seconds for this purpose.
Policemen owned their own uniforms which they were permitted to wear to and from work. However, most preferred to keep their uniforms in lockers located adjacent to the roll call area, and to change into and out of them on arrival and departure. The men arrived at headquarters at varying times before their tour of duty started, with some coming in just prior to roll call while others arrived anywhere up to 30 minutes before the start of roll call.
The majority of posts at the Arsenal were rotated among policemen on a daily basis and at roll call, which averaged about 5 minutes, the specific assignments for each policeman on that shift were called out by the shift supervisor. In addition, a roster of assignments, prepared the previous evening, was available for examination beforehand.
Upon completion of roll call, the policemen dispersed to their posts. Those who had assignments in the vicinity of headquarters proceeded to their posts by foot and relieved the policemen on the outgoing shift who returned to head *316 quarters. Those assigned to more distant posts (of which there were three) were transported there by motor vehicle, which in turn brought the outgoing policemen back to headquarters. These vehicles were driven by policemen assigned to the motor vehicle patrol for that shift. Policemen on that assignment were excused from roll call, and subsequent to the start of their duty shift made a cursory check of their vehicles to see that they were operational.
In practice, the hour for pre-shift activities (e.g. between 7:30 a.m. and 8:00 a.m. on the A shift) was more than sufficient to enable the incoming policemen to punch in, obtain their assignments, perform pre-duty post chores and relieve the policemen on the preceding shift in time for them to check out from headquarters on the hour. Indeed, members of the outgoing shift frequently returned to police headquarters before the end of their tour of duty, in which event they were on occasion given a specific assignment before checking out. Sometimes they utilized the time in brushing up on their training. However, it was not uncommon for the outgoing policemen to have leisure time in the interval before completion of their tour of duty.
Arsenal regulations provided that the policemen were to have a 30-minute lunch period during each work shift. The regulations prohibited them from leaving the Arsenal for lunch, and this restriction was in effect during most or all of the claim period. The policemen were free to have lunch anywhere within the Arsenal, where various eating facilities were available on the A and B shifts but not on the C shift, thus making it necessary for men assigned to that shift to bring their lunch. As a matter of personal choice, a majority of the policemen on the other shifts also brought their lunch. The luncheon meal could be eaten at police headquarters or at other areas within the Arsenal, as the individual saw fit. However, because of the vicissitudes of police work, no specified time for lunch was ordinarily prescribed so that a given policeman’s lunch period might vary from day to day.
Certain posts on the Arsenal required the constant presence of a policeman and, therefore, a man assigned thereto could not leave his post for lunch or other purposes until he was relieved by another member of the force. Accordingly, the *317 regulations made provision for relief posts in addition to the specified posts, and generally at roll call certain policemen were designated as relief men. If the force was shorthanded on a given day or if the relief men were occupied with other duties, the supervisory elements of the force acted as relief men. Generally during the claim period, relief was available to the policemen so that they could have the 30-minute lunch period. But on unspecified and irregular occasions, due to a shortage of personnel, relief of a policeman was not always possible with the result that he was deprived of his lunch period away from his post. This was not known to the Provost Marshal or the Security Officer, nor did any policeman complain to them about the situation. In the absence of complaint, and having seen various members of the force eating their lunch at the Arsenal’s cafeterias and snack bar, these two officials had reason to believe that the regulation prescribing a 30-minute lunch period was 'being fully complied with.
Not all posts on the Arsenal required assignment of relief men: some were manned by 2 or 3 policemen, thus enabling the men to relieve one another from duty for lunch and other purposes. In addition, a policeman assigned to a motor patrol was allowed to take his vehicle out of service and have his lunch period. Similarly a man assigned to a “clock patrol” could stop his clock and suspend his patrol for a 30-minute lunch period.
Pursuant to regulation, it was necessary for a policeman to call into headquarters and tell his shift supervisor that he was taking his lunch period and give him the telephone number where he could be reached. He was also required to call in when his lunch period was over. During his lunch period, the policeman was subject to a call back to duty in the event the Arsenal fire alarm sounded, or some other emergency situation arose. The evidence does not show that substantial work was actually performed in that time.
Against this background, the first question is whether plaintiffs were required to report for work 30 minutes prior to the start of their tour of duty. The record shows that no such reporting time was ever officially ordered or approved, orally or in writing, so as to permit recovery for overtime *318 compensation under the Pay Act. See Gaines v. United States, 132 Ct. Cl. 408 (1955); Tabbutt v. United States, 121 Ct. Cl. 495 (1952); Post v. United States, 121 Ct. Cl. 94 (1951). Nor were the policemen “induced or directed by (their) superiors directly or indirectly by writing or otherwise” to work this overtime period. Gray v. United States, 136 Ct. Cl. 312, 313 (1956); Anderson v. United States, 136 Ct. Cl. 365 (1956). It is quite true that some plaintiffs arrived at police headquarters at various intervals up to 30 minutes prior to commencement of their duty shift. However, this early arrival was not occasioned by any requirement or order, but rather was voluntary on the individual policeman’s part because of Ms own personal preference to change into and out of uniform at the locker room in police headquarters instead of wearing it to and from work as he was authorized to do. The fact that some plaintiffs voluntarily came to work earlier than required cannot support a claim for overtime compensation. Baca v. United States, 150 Ct. Cl. 70, 86 (1960); Goode v. United States, 25 Ct. Cl. 261, 267 (1890).
There remains the further consideration that verbal orders of the shift captains, which were tacitly approved by the Chief of Police, required the men to be armed at roll call with their guns and ammunition so that they would then be ready to assume their full responsibility. Assuming that such tacit approval constituted official approval witMn the meaning of the Federal Employees Pay Act (see Albright v. United States, 161 Ct. Cl. 356, 361 (1963)), at most the total time needed for an entire shift to draw weapons and ammunition from the gun room prior to roll call was 5 minutes, while the time needed for any one man to perform this activity did not exceed 15 seconds. In the circumstances of the present case, this is negligible and must be disregarded as de minimis. Anderson v. Mt. Clements Pottery Co., 328 U.S. 680, 692 (1942); Ahearn v. United States, 142 Ct. Cl. 309, 312 (1958). Furthermore, the time required to draw weapons and ammunition was more than offset by relief periods allowed policemen during which they could leave their posts for various reasons. Also serving as an offset were the various occasions when policemen enjoyed leisure *319 time in the interval between completion of their duty shift and the time for checking out.
As to plaintiffs’ contention that they did not have available a 30-minute lunch period, the evidence establishes that each plaintiff was entitled by regulation to a 30-minute lunch period per duty shift; that responsible officials of the Arsenal bad sound reason to believe that this regulation was being fully complied with; and that they made every reasonable effort to insure that such a period was available. The evidence also establishes that the regulation was for the most part complied with and that a 30-minute lunch period away from their posts was generally available, which the plaintiffs were permitted to utilize, as they saw fit, within limitations which appear reasonable and proper. The facts are thus quite different from those in Albright v. United States, supra. In that case civilian security guards, employed by the Norfolk Naval Shipyard, sought overtime compensation on the ground that they were required to report for work before their tour of duty began. Defendant conceded this, but sought to offset such extra periods of work with the time taken by the guards for their meals. The court denied the offset since a lunch period was not provided for in the regulations and the evidence showed that it was necessary for the guards to eat “on the job at their assigned posts, that is, while walking a beat, sitting at a stationary post, or while riding in a vehicle on a patrol assignment.” Id., pp. Ml.
Nor can plaintiffs recover for the unspecified and irregular occasions when they were deprived of a lunch period away from their post because of inability to obtain relief. Apart from absence of proof as to when these instances occurred, it is significant that plaintiffs made no complaint to the responsible officials; indeed, such officials had no knowledge of the situation. In these circumstances, work performed by policemen during these periods cannot be said to have been “officially ordered or approved” so as to be compensable under the Pay Act. Gaines v. United States, 132 Ct. Cl. 408 (1955); Tabbutt v. United States, 121 Ct. Cl. 495 (1952); Post v. United States, 121 Ct. Cl. 94 (1951).
*320 Plaintiffs’ principal contention is that since they were on a duty status for 814 hours per shift (e.g., from 7:30 a.m. to 4:00 p.m.) and were only paid for 8 hours, they were entitled to y2 hour additional compensation, notwithstanding that this time was set apart for lunch. The basis for the contention is that the lunch period was not “free time” since the policemen were subject to call back to duty in case of emergency. The difficulty with the argument is that an employee is not entitled under the Federal Employees Pay Act to compensation for time set aside for eating, even where the employee is on a duty status and such time is, therefore, subject to possible interruption. Compensation is available only if it is shown that substantial official duties were performed during that period. Thus, in Armstrong v. United States, 144 Ct. Cl. 659 (1959), cert. den. 361 U.S. 825, a group of civilian firefighters employed 'by the Air Force sought to recover overtime compensation under the Federal Employees Pay Act for time during which they were required to be on the employer’s premises and subject to call but during which time they were permitted to eat and sleep. This court held that under the particular facts of the case it appeared that no substantial duties were performed by plaintiffs during sleeping and eating time and consequently the time did not constitute “hours of employment” for overtime purposes within the meaning of the statute. See also Gaetke v. United States, 136 Ct. Cl. 756, 758 (1956); Collins v. United States, 141 Ct. Cl. 573, 575 (1958); Ahearn v. United States, 142 Ct. Cl. 309, 311 (1958); Bean v. United States, 146 Ct. Cl. 267, 269 (1959); Ahearn v. United States, 151 Ct. Cl. 21 (1960), cert. den. 364 U.S. 932 (1961). On the other hand, in Farley v. United States, 131 Ct. Cl. 776 (1955), and England v. United States, 133 Ct. Cl. 768 (1956), plaintiffs who were correctional officers at a Federal reformatory and required to remain there several nights a week were held entitled to overtime compensation for the time authorized for sleeping and eating because substantial labor was performed during that time.
In the present case, while the plaintiffs were subject to call during their lunch period in the event of fire or other emergency, the record fails to demonstrate that they performed *321 substantial official duties during that period and hence recovery for overtime compensation may not be permitted. Furthermore, the fact that the policemen were required to eat at the Arsenal is of no consequence; the Federal Employees Pay Act is not “meant to compensate an employee merely because he was required to * * * eat on the employer’s premises instead of at home.” Armstrong v. United States, supra (144 Ct. Cl. at 664).
In view of the foregoing, it is unnecessary to consider defendant’s argument that the claims are barred by the doctrine of laches or its plea of estoppel.
FINDINGS OF FACT
1. (a) All 96 plaintiffs in this case are citizens of the United States. 91 of the plaintiffs were employed at various periods of time during the six years prior to the filing of this petition on December 29, 1961, as civilian security policemen or guards at the Frankford Arsenal, Philadelphia, Pennsylvania. The remaining five plaintiffs are widows or the sole surviving heir of persons who served as security policemen or guards at this installation during the above period.
(b) Of the 96 policemen involved in this action, 27 had been employed at the Arsenal since 1948; a total of 75 had been so employed since 1951; and a total of 92 had been so employed since 1953. Two were employed in 1955, one in 1960, and one in 1961.
2. The Frankford Arsenal proper covers an area of approximately 128 acres and includes about 234 buildings.
3. (a) The civilian security police force at the Frankford Arsenal was a branch of the Intelligence, Security and Safety Office and was charged with the security of the Arsenal and its outlying installations. The police force was under the over-all supervision of the Provost Marshal, a commissioned officer of the U.S. Army, and under the direct supervision of the Security Officer (later called the Security Administrator) who was a subordinate of the Provost Marshal. The Chief of the security police was in charge of the day-to-day administration, operation and deployment of the policemen.
(b) The police force was composed of a chief, an assistant chief, shift captains (who were initially designated as *322 sergeants) and policemen (wbo were initially designated as guards). Of the 96 plaintiffs involved in the suit, 2 were chiefs of police, 8 were captains or acting captains, and 18 were lieutenants or acting lieutenants. These ranks comprised the supervisory element of the police force.
4. At all revelant times, the police force at the Arsenal was employed on the basis of an 8-hour working day, five days per week. However, at various periods the force was required to work six days a week for which it received overtime compensation.
5. (a) The police force operated around-the-clock on the basis of 3 shifts known as the “A”, “B” and “C” shifts. Beginning in June 1956, the tour of duty for each of these shifts was as follows:
A shift — 7:30 a.m. to 4:00 p.m.
B shift — 3:30 p.m. to 12 midnight
C shift — 11:30 p.m. to 8:00 a.m.
(b) Prior to June 1956, the tour of duty for each of these shifts commenced and ended 30 minutes earlier than the times listed above.
(c) Prior to 1958, these shifts were generally manned on a two-week or monthly rotation basis. Thus, a policeman would be assigned to the A shift for two weeks or a month, following which he would be assigned for the next two weeks or month to the C shift, then to the B shift, after which he would revert to the A shift and so on. In 1958 rotation of shifts was discontinued and policemen were generally assigned permanently to one of the 3 shifts.
(d) From April 30,1948, until December 31,1950, policemen at the Frankford Arsenal were employed on the basis of a straight 8-hour day. The shifts operated as follows:
A shift — 8:00 a.m. to 4:00 p.m.
B shift — 4:00 p.m. to 12 midnight
C shift — 12 midnight to 8:00 a.m.
6. The operation of each shift was under the immediate charge of a shift captain who reported directly to the chief of police. The shift captain was responsible for the assignment of policemen to various posts; for insuring that policemen complied with the duties as specified in the regulations and directives'; and for seeing to it that the policemen on his *323 shift obtained relief from, their posts so that they could have a 30-minute lunch period.
7. (a) The police force operated under regulations known as Standard Operating Procedures (S.O.P.). These regulations prescribed general orders and instructions concerning the duties of the policemen and the specific duties applicable to designated posts.
(b) S.O.P. 513 (Revised June 1956) read as follows:
LUNCH PERIOUS AND RELIEF
1. Duty hours for the Security Branch for each shift is as follows:
a. “A” Shift — 0730-1600 hours
All personnel of this shift will report for duty and ring in their time cards no later than 0730 hours, at which time they will be issued arms and ammunition, inspected in ranks and given such instructions as necessary by the Security Police Captain. Those men assigned for duty at Gage Laboratory will report directly to their respective places at the time prescribed above and will receive arms, ammunition and orders from the Senior Security Policeman in charge at that particular installation. All Security Policemen will then be posted in sufficient time to relieve the old Security Policemen by 0800 hours.
b. “B” Shift — 1530-£lfi0 hows
All persomiel of this shift will report for duty and ring in their time cards no later than 1530 hours, at which time they will be issued arms and ammunition, inspected in ranks and given such instructions as necessary by the Security Police Captain. Those men assigned for duty at Gage Laboratory will report directly to their respective places at the time prescribed above and will receive arms, ammunition and orders from the Senior Security Policeman in charge at that particular installation. All Security Policemen will then be posted in sufficient time to relieve the old Security Policemen by 1600 hours.
c. “O” Shift — £330-0800 hours
All personnel of this shift will report for duty and ring in their time cards no later than 2330 hours, at which time they will be issued arms and ammunition, inspected in ranks and given such instructions as necessary by the Security Police Captain. Those men assigned for duty at Gage Laboratory will report directly *324 to their respective places at the time prescribed above and will receive arms, ammunition and orders from their Senior Security Policeman in charge at that particular installation. All Security Policemen will then be posted in sufficient time to relieve the old Security Policemen by 2400 hours.
2. The attention of all Security Policemen is directed to General Security Police Order #4, which provides that a Security Policeman will quit his post only when properly relieved. This means specifically that when, a Security Policeman is officially posted, he is charged with the duties as prescribed in the General and Special Orders, and such other instructions as he may receive from his Security Police Captain until he is officially relieved.
3. It is recognized that at certain periods a Security Policeman requires relief for various reasons. The Security Police Captain, therefore will see that each Policeman receives relief.
4. Lunch Period: The Security Police Captain will authorize absence from duty for a period not to exceed thirty (SO) minutes. The Security Policemen on their lunch period will not be permitted to leave the installation where they are posted and they must be at such a place where they can be reached by telephone and the nearest telephone number will be given to the Security Police Captain prior to taking the lunch period. When messing facilities are not available Security Policemen will be required to bring their lunch.
(c) S.O.P. 513 superseded a similar regulation which had been in effect from December 31, 1950. Under the earlier regulation the hours of duty for each shift started and ended 30 minutes earlier. The earlier regulation also contained reference to three outposts, Tacony Depot, Burlington Warehouse and Gage Laboratory, and specified that “the senior guard in charge of each installation is authorized to grant the prescribed reliefs and lunch periods and he is charged with maintaining an accurate record of such reliefs and lunch periods and will forward this report to the Shift Leader at the completion of his shift.” The Arsenal police force’s responsibility for the Tacony and Burlington outposts ceased some time prior to April 1956 and S.O.P. 513 contained no reference to them.
(d) S.O.P. 511 (Revised January 1956) entitled “Security Police Regulations” provided in part as follows:
*325 The following restrictions and regulations are issued to the Security Policemen for strict compliance:
* ❖ * * *
14 It is ordered that all Security Policemen be thoroughly familiar with all General and Special Orders, and especially know the Special Order of his assigned post.
»{♦ H* ^
17. There is no time allowed during the tour of duty for any breaks or intermissions. This is not to be construed as preventing a Security Policeman from eating his lunch or advising the Police Captain that relief is necessary.
8. As indicated above, the policemen were required to report for duty at the beginning of the duty shift (at 7 :'30 a.m. on the A shift, 3:30 p.m. on the B shift, and at 11:30 p.m. on the C shift) and to punch a time clock in police headquarters at the designated time which signaled the commencement of their duty shifts for work and pay purposes.
9. (a) At or shortly after 7:30 a.m., 3:30 p.m. and 11:30 p.m. (depending on the shift) a roll call and inspection were held in police headquarters. At the roll call each policeman was required to be in full uniform which had to be clean and neatly pressed; to have his equipment clean and shined; and to be neat in appearance. Pursuant to verbal orders of the shift captains, which were tacitly approved by the Chief of Police, he was also required at roll call to have on his pistol or revolver, together with ammunition therefor. In short, at roll call each policeman was expected to be ready to assume his full responsibility. In the event a policeman stood roll call without his side-arm, he was admonished but not marked late.
(b) Generally it was necessary for the policemen to draw their weapons and ammunition from the gun room (located in police headquarters) prior to the beginning of their duty shift. Based on the testimony and based on this Commissioner’s view of the operations of the B shift, it is found that the total time needed for about 20 policemen to stand in line, turn in their gun chits and draw their weapons and ammunition was not in excess of 5 minutes, and that the time required for one policeman for this purpose was not in excess of 15 seconds.
*326 (c) On various occasions, weapons and ammunition were issued to the policemen after the time prescribed for commencement of their duty shift.
10. In order that the policemen could withdraw their weapons and ammunition prior to the duty shift, a lieutenant was directed to open the gun room prior to the start of the shift. To compensate him for early reporting, he was allowed to terminate his tour earlier than the prescribed time. Generally, the lieutenant reported for duty 15 minutes prior to the shift (e.g., at 7:15 a.m. on the A shift), opened the gun room at this time, made an inventory of its contents, and then issued the side-arms to the policemen. He was authorized to leave for home 15 minutes early that day.
11. The policemen were required to be in uniform and to wear their weapon during their entire tour of duty. They owned their own uniforms and received an allowance from the Arsenal to cover their cost and replacement. They were permitted to wear their uniforms to and from work. However, a majority of the policemen preferred to wear their civilian clothes to and from work and kept their uniforms in their lockers located adjacent to the roll call area, and changed into and out of them on arrival and departure. Policemen arrived at police headquarters at varying times before their tour of duty started. Some came in just prior to roll call, while others arrived anywhere up to 30 minutes before.
12. (a) At the roll call the assignments for the policemen were called out and special instructions given. The roll call varied from 1 to 10 minutes and averaged about 5 minutes.
(b) The specific assignment of policemen to the various posts was generally prepared on the preceding day and listed on a roster which the policemen could examine prior to roll call. The purpose of calling out the assignments at roll call was to make last-minute changes in case a policeman was sick or an emergency situation developed. In addition, projection schedules were made up for a monthly period and posted on the bulletin 'board at police headquarters, indicating the assignments and annual leave of the men for the month. This schedule was revised from time to time because of emergency or other conditions.
*327 (c) Most of the posts at the Arsenal were rotated from policeman to policeman on a daily basis. However, several posts were assigned on a permanent basis.
13. (a) After roll call, the policemen dispersed to their posts. Those assigned posts in the vicinity of police headquarters walked to their posts and relieved the outgoing policemen; those assigned to more distant posts were transported there by motor vehicle, which in turn brought nolica-men from the outgoing shift back to headquarters. The most distant post on the Arsenal was about one mile from headquarters ; and only three posts were beyond walking distance.
(b) A policemen who was assigned to motor vehicle patrol was excused from roll call and subsequent to the start of the duty shift (7:30 a.m., for example) would make a cursory check of the vehicle to make sure it had not been involved in an accident or otherwise damaged during the preceding shift. Following completion of roll call, the policemen assigned to the vehicles were ready to commence operation thereof.
14. In summary, while the policemen’s tour of duty began at 7:30 a.m. on the A shift, 3:30 p.m. on the B shift and 11:30 p.m. on the C shift, they did not actually assume their daily duty posts until some time prior to the hour following the commencement of the duty shift. For example, while policemen on the A shift were required to report for work at 7:30 a.m., they would not assume their actual daily duty post until some time prior to 8:00 a.m. The pre-shift activities during which the policemen responded to roll call, received their assignments and any special instructions, and walked or were driven to their posts to relieve policemen on the outgoing shift could be accomplished subsequent to the required reporting time in sufficient time to enable members of the outgoing shift to be relieved and punch out on the hour on which their tour of duty ended. For example, the A shift which reported for work at 7:30 a.m. would relieve the C shift in sufficient time to enable policemen on that shift to punch out at 8:00 a.m. This was also true relative to relieving the other shifts. After having been relieved from their posts, members of the outgoing shift assigned to posts in the Arsenal returned to police headquarters to sign out. Frequently they returned before the end of their tour of duty, in which event they were *328 sometimes given specific assignments to be accomplished before the check-out time. On occasion they utilized the time in brushing up on their training. And on occasion they had leisure time for the interval.
15. (a) The posts to which the policemen were assigned were designated by numerals; e.g., Post No. 1, Post No. 2, etc. These designations ran up to 32, but this does not indicate that there were 32 posts in operation at any one time since during the claim period various posts were discontinued and additional posts created. There were more posts in 1955 than at the present, and the police force has been reduced during this period. In addition to the posts, the policemen manned 6 gates until 1958 when only 4 gates were so maimed.
(b) Certain posts and gates were maimed by one policeman ; others by two or more policemen.
(c) The number of posts and gates that were manned varied from shift to shift with more in operation on the A shift than on the B or C shifts. In 1956 about 30 policemen worked the A shift, 25 policemen the B shift and 20 the C shift. As of May 1962 about 22 policemen worked the A shift, 17 policemen the B shift and 14 the C shift.
(d) Prior to April 1956 policemen from the Arsenal were assigned to outposts outside the confines of the Arsenal, designated as the Tacony Depot and Burlington Warehouse. After April 1956 policemen were no longer assigned to these two outposts. The only other outpost was the Gage Laboratory which was about 4 miles from the center of the Arsenal. This post was manned by two policemen during the greater part of the claim period. Policemen assigned to this outpost went there directly from their homes and were not subject to any pre-shift duty activities. Upon arriving for work at 7:30 a.m., for example, the policemen relieved the on-duty policemen and called the Arsenal to advise the shift captain of this fact.
16. (a) Certain posts required the constant presence of a policeman, and thus a policeman assigned to such a post could not leave until he was relieved. The S.O.P. therefore made provision for relief posts in addition to duty posts. Policemen assigned to these posts were utilized to relieve other policemen at their posts for lunch or other purposes. Gen *329 erally at roll call certain policemen were designated as relief men. However, if no one was designated for relief, the shift captain instructed certain policemen to relieve others. In addition, policemen on the posts were permitted to call in and request relief for lunch or other purposes. On occasion designated relief men were engaged in other duties which precluded them from acting as relief in which event the supervisory personnel, including the assistant chief, the captains or lieutenants, frequently acted as relief men to enable policemen to leave their posts for lunch or other purposes.
(b) In general, relief policemen or members of the supervisory group were available to enable each policeman to be relieved from his post and have a 30-minute lunch period. However, there were exceptions: on irregular and unspecified occasions, due to a shortage of personnel or because of emergency conditions, relief of a policeman was not possible to enable him to have the lunch period.
(c) Some posts had 2 or 3 policemen assigned to them which enabled the men to relieve one another from duty for lunch and other purposes.
(d) A policeman assigned to motor patrol generally was allowed to take the vehicle out of service and have his lunch period. Another vehicle would then cover that post.
(e) At police headquarters, there were usually sufficient men assigned to effect relief of each policeman for a lunch period.
(f) During that period of the claim up to late 1958 or early 1959, policemen on certain posts were required to carry clocks on their patrols of various buildings within the Arsenal and at the outposts. On weekdays the clocks were only utilized between the hours of 6:00 p.m. and 6:00 a.m. (which involved only the B and C shifts); on Saturdays and Sundays they were used on all three shifts. There were six such “clock patrols”. The clocks were portable devices which contained dial sheets or tapes which recorded impressions or “hits” when placed in contact with clock stations located in the various buildings. The time of each “hit” was recorded on the dials or tapes which were read thereafter by the supervisor to make sure that the policemen were patrolling the various installations on their posts. When a policeman on the clock *330 patrol wanted to take bis lunch period, he stopped the clock, called the lieutenant at police headquarters and advised him as to when he was taking and terminating his lunch period. This information was marked down by the lieutenant on a call sheet and was later checked with the clock dial or tape to verify the lunch period absence. While assigned to the clock patrol, a policeman was unable to take an excessive lunch period because his absence was recorded both on the call sheet and on the dial or tape.
17. While the policemen were entitled to and generally had available a 30-minute lunch period, because of the vicissitudes of police work, no specified time for lunch was ordinarily prescribed and, therefore, the lunch period of an individual policeman might vary from day to day. For example, on one day a policeman on the A shift might have available to him the period from 12:30 p.m. to 1:00 p.m. for lunch; on the next day the period from 11:30 a.m. to 12 noon.
18. Generally it was necessary for the policeman to call into headquarters and advise the shift supervisor that he was taking his lunch period and where he could be reached, and to call in when the lunch period was over.
19. During his lunch period, the policeman was subject to call back to duty in the event the Arsenal fire alarm sounded, or an emergency situation arose. The evidence does not show that plaintiffs performed substantial work during their lunch period. Nor is there any evidence in the record showing the number of hours of actual work performed by policemen during this period.
20. S.O.P. 513, which continued in effect until March 1962, prohibited a policeman from leaving the Arsenal during his lunch period. This prohibition was adhered to at least until August 1960 when a new administrative policy was apparently adopted whereby a policeman could leave the Arsenal to eat lunch provided he obtained permission from his supervisor.
21. (a) During their lunch period the policemen were free to go anywhere within the Arsenal to eat their lunch. Various facilities were available on the Arsenal for eating purposes. On the A shift two cafeterias were in operation five days a week, Monday through Friday, one of which accom *331 modated 800 persons, the other 100 persons. Also available was a snack bar that was open 6 days a week but closed on Sunday, where hot meals could be obtained. This snack bar, which had about 9 tables where personnel could sit down and eat, was open during the day and until 12:30 a.m. except Saturday when it closed at 9:00 p.m. However, the grill at the snack bar generally closed at 10:00 p.m. during weekdays so that from then until 12:30 a.m. only cold sandwiches and beverages were available. Several canteens were also in operation throughout the Arsenal which served soup, sandwiches and beverages.
(b) There were no eating facilities available on the Arsenal during the C shift.
22. (a) About 85-90 per cent of the policemen on the A shift brought their lunch with them because of their own personal preference and ate at police headquarters or at other areas within the Arsenal, as they saw fit. Some policemen on that shift purchased and ate their lunch at the cafeterias or snack bar.
(b) Because of the absence of eating facilities on the C shift, policemen assigned to that shift had to bring their lunch which they could eat at various areas within the Arsenal, as they saw fit.
23. In the event a policeman was unable, because of work commitments, to have a lunch period, he was entitled to overtime compensation or compensatory time off.
24. (a) At no time did the Provost Marshal or his immediate subordinate, the Security Officer, ever receive any complaint from any member of the police force that policemen did not always have available a 30-minute lunch period.
(b) From time to time the Provost Marshal and the Security Officer observed policemen eating lunch in the cafeterias, the snack bar and elsewhere. They had no reason to believe, nor did they know, that the regulation allowing a 30-minute lunch period was not always complied with.
(c) On occasion men complained to the Chief of Police, who is a plaintiff here, that they were not always getting the 30-minute period. However, the Chief did nothing about it and did not bring it to the attention of the Provost Marshal. The Assistant Chief of Police, also a plaintiff here, never *332 beard of a man not getting relieved for luncli and never received any complaint about tbe length of the lunch period, but had heard complaints about the time a man was relieved. On numerous occasions he saw men under his supervision on the A shift eating lunch in the cafeterias.
(d) Members of the police force had the right to take up with an assigned representative in the personnel office any grievance relating to their employment. Plaintiffs knew who their representative was and were familiar with their right to seek relief by way of recourse to such representative. On occasion some of the plaintiffs utilized the grievance procedure to seek redress in respect to various matters concerning their employment. However, at no time did they use this procedure and complain to the grievance representative that they were required to report to work prior to the commencement of their duty shift, or that they were not receiving the 30-minute lunch period specified by the police regulations.
25. (a) Beginning in January 1961, 93 of the plaintiffs filed claims with the General Accounting Office by letters which were virtually the same. A typical letter read as follows :
I am presently employed at the Frankford Arsenal, Philadelphia 37, Pennsylvania, as a Security Policeman (formerly known as guard) and am required to be on duty eight and one-half (8y2) hours each day, for which I receive pay for only eight (8) hours.
I would like to file a claim for back pay, based on a recent decision by the United States Court of Claims, which ruled that, “Federal employees who are required to donate free time to their agency must be paid for the extra time at the overtime rate of compensation for their grade.”
(b) In addition, plaintiff Dubin sent the following letter to the GAO:
I am presently employed in the Frankford Arsenal, Philadelphia, in the Physical Security Branch since 1940. In 1950, there was a change. Our Chief told us that we would have to come in a half-hour earlier, so that we would be in uniform to stand a roll-call inspection prior to being assigned to our various posts, in order to relieve the men of the previous shift in time for them to turn in the revolvers, change their uniforms to street *333 clothing and ring out their time cards on the hour. I was advised by the Civil Service Reporter [publication] to write to this office, in order to file a claim for back pay, because I am forced to give a half hour everyday without being compensated. Last month [December] I was in the Frankford Arsenal Comptroller’s office and spoke to Mr. Redlinger, about the claim for back pay voucher form, and was instructed to write to the Comptroller General’s office, as there were no forms for claims for back pay in his office.
(c) Plaintiffs’ claims were disallowed by the GAO.
(d) While plaintiffs in their letters to the GAO only claimed 14-hour overtime for each duty shift, they seek here to recover 1-hour overtime for each duty shift.
26. It was not until after these claims were filed with the GAO that the Provost Marshal was aware of the plaintiffs’ contentions about not receiving a 30-minute lunch period per duty shift. Upon being made aware of these contentions, the Provost Marshal discussed the matter with the Chief of Police who gave him assurance that the policemen had been getting their 30-minute lunch period. The Provost Marshal then issued instructions to the Chief that no policeman, under any circumstances, was to be denied his lunch period and that if anyone were deprived of his lunch because of work commitments, he was to receive overtime or compensatory time off. He also caused to be issued in February 1962 a clarifying directive (effective the following month) to make it crystal clear that policemen were to have a 30-minute free lunch period. The Provost Marshal further required the Chief of Police to certify to him that the policemen were getting their lunch period. The Chief of Police thereafter obtained statements from his shift captains that each man had available at least 30 minutes for lunch or other purposes and upon receipt of this information advised the Provost Marshal in writing that his directive was being carried out.
27. Pursuant to Rule 38(c), the parties entered into a stipulation, approved by the Commissioner, limiting the issues of law and fact relating to the right, if any, of the plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
*334 CONCLUSION 03? LAW
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

 This statute provides in part:
“All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed by officers and employees to whom this subchapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at * * * an amount equal to one and one-half times the hourly rate of basic compensation of such officer or employee * *