Per Curiam :
This is a suit by plaintiff to recover judgment for the value of quarters and utilities furnished to him by defendant, which amount was deducted from his salary, and, alternatively, to recover overtime compensation. Upon consideration of the pleadings and briefs of the parties, oral argument of counsel, and the findings of fact of the trial commissioner, the court approves the findings and concludes that plaintiff is entitled to judgment in the sum of $14.78 as compensation for overtime services performed by him in excess of his regular workweek but is not entitled to recover *547 on the remainder of his claim representing the value of quarters and utilities furnished to him and as to this portion of his claim the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
Plaintiff seeks to recover an amount of money representing the value of quarters and utilities furnished to him by defendant, which amount was deducted from his salary as fire chief at the United States Navy Yard, Charleston, South Carolina, during the period from December 1, 1952 through February 28, 1954. Plaintiff claims that the quarters and utilities were furnished to him by defendant in lieu of compensation for overtime services which were due him by reason of his performance of emergency fire duties throughout a 24-hour day and, accordingly, that the amount of money representing the value of the quarters and utilities should not have been deducted from his salary.
Alternatively, plaintiff seeks to recover overtime compensation for services performed by him during said period in excess of his regular workweek.
Defendant asserts that under the provisions of sections 70, 71, and 75a of Title 5, United States Code, the value of the quarters and utilities furnished to plaintiff was properly deducted from his salary. Defendant “concedes plaintiff is entitled to recover overtime compensation for any services actually performed outside his regular workweek or outside his regularly scheduled overtime (for which he has already been paid), unless the amount of such work is inconsequential and overtime compensation therefor is not recoverable under the de minimis rule.”
1. Plaintiff, a non-veteran, is a citizen of the United States and resides in Charleston, South Carolina, where he is employed as the superintendent of the Betheny Cemetery.
2. (a) On February 17,1941, he was initially employed at the United States Navy Yard, Charleston, South Carolina (sometimes referred to as the “navy yard,” “base,” or “ship *548 yard”), in a position of.guard or watchman as a classified civil service per annum employee.
(b) In September 1941 he was employed at the navy yard as an engineman firefighter, a wage board position, for which he was paid on an hourly basis. He was thereafter promoted to a leadingman engineman (firefighter), also a wage board position, for which he was paid on an hourly basis.
3. (a) Beginning on June 9, 1942, plaintiff occupied furnished quarters on the base. From this date until May 1, 1943, the furnished quarters and utilities were supplied to plaintiff by defendant without charge.
(b) A memorandum, dated August 13, 1942, from the commandant of the navy yard to the disbursing officer on the subject of Annual Appraisal of Civilian Quarters reads in pertinent part:
1. In compliance with reference (a) and in accordance with reference (b), it is certified that Claude E._ Crawford, Leadingman Engineman (Firefighter), is furnished quarters and light, in lieu of other compensation for special duty as Firefighter, responsible for fire fighting equipment, and for emergency duty as required day or night, in connection with police and fire protection; that the appraised value is:

Per annum

Bental value of quarters, unfurnished building- $216. 00
Lights: — ._- 48. 00
Total rental value, quarters as furnished_ 264.00
Salary of Leadingman Engineman. (Firefighter)-3,152.88
Total compensation of the position_3,416. 88
2. The quarters furnished Mr. Crawford were occupied J une 9,1942, and the yard labor roll for period of August 3-9, 1942 indicates such allowances retroactive from the date of occupancy. .
,4. (a) Under date of March 23, 1943, the commandant of the navy yard recommended to the Assistant Secretary of the Navy that the police and fire departments of the navy yard be separated and that plaintiff “be rerated and classified as Senior Patrol Supervisor (Fire Chief), CÁF-9, at $3,400 per annum.”
*549 (b) The job classification sheet which accompanied the recommendation and which was prepared and signed by the assistant captain of the yard and signed by the captain of the yard, as the reviewing officer, described the work as follows:
As Chief of Fire Department is responsible for the efficient operation of the Fire Department. Supervises Battalion Chiefs in the training of employees in fire-fighting, ladder evolutions, hose evolutions, salvage operations, life saving, motor and pump operation, fire hydraulics and ventilation. Supervises Battalion Chiefs in the inspection of the location, construction, and contents of all buildings, fire doors, fire escapes, elevators and exits; location, operation and maintenance of all sprinkler systems, control valves, water mains and stand pipes; the location, construction, venting, capacity, control valves and fire protection system of all oil tanks and gasoline storage tanks. Supervises Battalion Chiefs in the inspection of buildings, shops, warehouses, quarters, docks, piers, lumber storages, building ways and ships under construction for the purpose of eliminating fire hazards and to insure compliance with fire regulations and to report any unsatisfactory or dangerous conditions to the Civil Officer in Charge of Protective Force. Supervises the department in fire drills, air raid drills, incendiary bomb control and the combatting of toxic gasses; the inspecting, testing and repairing of fire hose; the operation, care, repairing and maintenance of foamite generators, light generators, spot and flood lighting systems, life lines, fife belts, life nets, gas masks, mhalators and portable fire extinguishers; the use of first aid, artificial respiration, chemicals, special appliances and equipment carried on motor. Maintains discipline, morale and the efficient operation of the department, including the care and maintenance of equipment and stations in the department ; ordering all supplies; handling all reports and correspondence; preparing work schedules and shifts. Supervises all fire drills in shops throughout the yard. Supervises the maintenance of fire alarm boxes and system. Performs other related and administrative duties as may be necessary.
The job classification sheet listed the percentage of total time given to each task as 100 per cent. The number of working hours of the position was stated to be 48 hours per week. The salary rate was listed as $3,200. Item 13 of the sheet reads:

*550

*551 There was no “X” inserted in any of tlie boxes in item 13 and there was nothing added after the language “Duties performed in consideration of allowances, and necessity therefor.” All other items of the sheet were filled in.
Item 14 of the sheet reads:
14. This sheet has been read by the incumbent of the position.
Comdr. ÜSN (Ret)
March 16, 1943 s/n. s. tiohenob Asst. Capt. of Yd. (Date) (Signature of preparing officer) (Title)
(c) On April 16,1943, the Assistant Secretary of the Navy granted authority to the commandant of the navy yard to establish the position described on the job classification sheet.
5. (a) On May 1,1943, plaintiff’s status was changed from a wage board employee to Fire Chief, CAF-9, a classified civil service position, with a salary of $3,200 per annum.
(b) Beginning on May 1, 1943, defendant deducted from plaintiff’s basic salary the value of the quarters on the base and utilities which were furnished to plaintiff by defendant. Such deductions were made continuously until February 28, 1954, after which time plaintiff was required to pay cash for the quarters and utilities.
(c) A memorandum, dated January 1,1944, from the commandant of the navy yard to the disbursing officer on the subject of Annual Appraisal of Civilian Quarters, Fiscal Year 1944, reads in pertinent part:
1. In compliance with reference (a) and in accordance with reference (b), it is certified that Claude E. Crawford, Yard Fire Chief, at $3,200 per annum, is furnished quarters, lights, and household equipment in lieu of other compensation for special emergency fire duties performed at night after working hours in connection with fire and storm protection of government vessels and waterfront property; that the appraised rental value is:

Per annum,

Rental Value of Quarters and Equipment_ $216.00
Lights, Heat, and Water_ 108.00
Total Rental Value, Qtrs. as furnished_ 324.00
Yard Eire Chief’s Salary_2, 876.00
Total Salary- 3,200.00
*552 6. (a) At the time plaintiff first occupied the quarters at the base (beginning June 9, 1942), he was doing fire protection and fire security work 5 days' (40 hours) a week. In 1943 plaintiff’s workweek was increased to 6 days and thereafter his workweek was increased to 7 days. Plaintiff was paid for the regularly scheduled overtime (8 hours overtime on a 48-hour week and 16 hours overtime on a 56-hour week).
(b) Employees of the fire department, including plaintiff and employees of the police department, were classed as special duty service employees and were required to be available for such service at all hours. In addition to working the regular 8-hour day, plaintiff was required to respond to emergency calls. A record of the emergency calls was kept in logs which were maintained under plaintiff’s supervision. At the trial plaintiff was asked whether the log books showed the time that he actually worked during the emergency calls. He responded, “In some instances I believe they will, others they will not.”
7. The body of a memorandum dated December 12, 1946, from plaintiff, as fire chief, to the commandant of the base, entitled “Discrimination Between IYa and IYb Employees on Quarters, Etc.” reads:
Reference: (a) CPL&D46-234 of 7 November 1946, Par. #8.
1. Reference (a) provided that, for instance, that a Chief Pilot of the Charleston Naval Shipyard receiving a total base salary of $5,380.00 before receipt of the reference and from his pay the sum of $18.00 ($468.00 per annum) was deducted biweekly, would have the base pay changed and the value of quarters, etc., added as an addition to $5,380.00, making his total pay now shown on the roll as- $5,848.00 from which $18.00 is deducted biweekly ($468.00 per annum). In other words, he and similar group IVa employees received a promotion of the value of quarters, etc., i.e., $468.00 per annum.
2. My salary at present is $4,400.40 (CAF-9 with 3 increments) from which $18.00 is deducted bi-weekly based on quarters of $468.00 per year.
3. Now, any CAF-9 with 3 increments will receive the sum of $4,400.40 per annum without being subjected to performing special duty and being available. Quarters are given for availability to perform special duty and not as compensation for actual after hours performance; *553 overtime being authorized by “OIR,” for such performance. ' However, during the war years I did not receive any overtime, whatsoever, for work performed outside of regular working hours although T worked an average of twelve (12) hours per day, seven (7) days per week, and in return only received eight hours pay per day.
4. In a letter from the Commandant, Navy Tard to Disbursing Officer dated 1 January 1944 in part reads as follows: “Claude E. Crawford, Yard Eire Chief, at $3,200 per annum, is furnished quarters, lights and household equipment in lieu of other compensation for special emergency fire duties performed at night after working hours-”. Even though I never received pay for special duty performed, other special duty employees were paid for services rendered outside of normal working hours. In other words, I paid rent to live in quarters in order that I could perform work after normal working hours for which I received no compensation or consideration, whatsoever.
5. Conclusion: Discrimination was made when the IYa employees, subject to special duty, had the value of quarters, etc. added to their base pay to arrive at a higher base pay; no change being made for the IVb special duty employees as in my case. Secondly, why the statement in Eeference (a) that, in quote, “_em-ployees assigned to the special duty service whose compensation is fixed by law (The Classification Act of 1923 as amended) shall not receive any compensation for such service in addition to the per annum pay of their positions, since their rate of pay is determined by law and nothing may be added thereto except as provided by law.”
6. The above partially quoted statement directly is a mis-statement of fact, since a CAF-9 working in the Production Department (with 3 increments for service) would receive the same base pay as I do, yet I am supposed to receive the valuation of quarters, etc. figured in my base pay.
7. My base pay should be $4,400.00 [sic] per annum plus $468.00 making $4,868.40 from which the sum of $18.00 ($468.00 per annum) would be deducted bi-weekly which would make a distinction in my case compared with the other CAF-9s throughout the Shipyard, and would eliminate the discrimination compared with method of computing quarters, etc. for IVa special duty employees.
8,In 1947 plaintiff “raised the question of payment for quarters” during a conversation with Captain C. H. Jenkins *554 who was then administrative officer at tbe base. Captain Jenkins told plaintiff that plaintiff’s occupancy of the quarters on the base was a condition of his employment. Plaintiff discussed the matter with Captain Jenkins’ successor administrative officers and consistently objected to the deduction from his pay of the value of the quarters which he occupied on the base.
9. (a) On August 26, 1953, a rental board, pursuant to directives from the Bureau of the Budget and the Navy Department, established charges for rental housing furnished to Federal employees, including military personnel. The board had been directed to establish charges “similar to those prevailing for comparable private housing and comparable with local domestic rates for similar services in the same area.” The board increased the charges for plaintiff’s quarters and utilities, effective October 1, 1953. Plaintiff was advised by the board that he could appeal to the commander of the shipyard if he felt that the new charges were not appropriate.
(b) By memorandum dated August 31, 1953, the commander of the shipyard requested instructions from the chief of the Bureau of Ships as to the correctness of the shipyard’s practice of deducting the value of quarters and utilities from plaintiff’s salary, which at that time was $6,125 per annum (GS-10, sixth step).
(c) A responding memorandum dated September 3, 1953, from the chief of the Bureau of Ships advised the commander of the shipyard in effect that since the value of quarters furnished graded employees is a part of their basic compensation, and since the compensation of graded employees cannot be increased except as provided by law, the shipyard was correct in deducting the value of the quarters furnished plaintiff.
(d) Under date of September 23,1953, plaintiff appealed to the commander of the shipyard the August 26, 1953, decision of the rental board. Plaintiff asserted, among other things, that the quarters and utilities were “in lieu of other compensation for special emergency fire duties as may be required day or night,” and that the appraised value of the quarters and utilities was excessive.
*555 (e) A responding memorandum dated October 8, 1953, from the commander of the shipyard advised plaintiff that the question of the deductions from plaintiff’s salary had already been referred to the Bureau of Ships which had confirmed the correctness of the practice; that plaintiff could appeal the decision to the Assistant Secretary of the Navy for Air through established grievance procedure; and that in regard to plaintiff’s claim that the appraised value of the quarters and utilities was excessive, plaintiff could submit specific information in that regard for consideration by the rental board.
10. (a) By memorandum dated October 13,1953, plaintiff appealed to the Assistant Secretary of the Navy for Air (Navy Comptroller) in regard to the deductions from his salary of the value of the quarters and utilities furnished him. Plaintiff asserted, among other things, that he was “required to be immediately available on a twenty-four hour basis, and to render special duty services outside of regular working hours in emergencies” for which no compensation or other emoluments were received.
(b) In order to furnish the Navy Department facts in connection wtih plaintiff’s appeal, the administrative officer of the shipyard prepared a memorandum dated November 20, 1953, the body of which reads:
1. Deference (b) requested information as to whether or not the subject employee had been required or authorized to perform work outside of regular working hours for which he received no compensation, and further requested that if he had performed such work without compensation that information be provided as to when the work was performed. Reference (b) also cited certain quotations from reference (a) pertaining to the authority for the employment of special service employees in the regular duties of their rating during hours outside of their scheduled work day or work week and that they could be compensated'therefor.
2. No specific directive or verbal instructions have been issued to subject employee requiring or authorizing him to perform work outside of regular working hours without compensation other than Certificates of Appraisals of Quarters which are considered as official directives *556 and which, in each case, have provided in effect that he “. . . is furnished quarters and allowances in lieu of other compensation for special emergency fire duties as may be required day or night in connection with fire and storm protection of Government vessels and property . . . The foregoing quotation appears to be a definite requirement for the availability and rendering of special duty services after regular working hours without monetary compensation. Since 1942, when Mr. Crawford was assigned to special duty service, he has been available on a twenty four (24) hour basis and has rendered service after hours but, in view of his strict interpretation of the wording and provisions of the Certificates of Appraisals of Quarters as referred to above, he has considered that he was not entitled to any monetary compensation therefor and has made no application for overtime pay or other special remuneration and, as a result, instead of being furnished quarters et al in lieu of other compensation he has, in effect, suffered a deduction for same from his pay for each pay period during which he rendered services in emergency outside of his scheduled work day or work week.
8. Attention is invited to the fact that the quoted portion of reference (a), which appears in paragraph 1 of reference (b), makes no mention of normal conditions which are cited as the first sentence of NCPI 85.3-4 which reads as follows: “3-4 Special Duty Service. Under normal conditions employees assigned to the special duty service shall not be required to perform duty outside of their scheduled work day or work week. When necessary, special duty service employees may be employed in the regular duties of their ratings. . . . etc. If required to perform work within the regular duties of their ratings on holidays occurring within their basic 40-hour work week, special duty service employees are entitled to holiday premium pay for such work. See NCPI 225.” It appears to the originator that subject employee has a legitimate complaint and that he may readily be entitled to compensation in addition to that already provided.
4. Enclosure (1) contains extracts from the Journal of the Fire Branch which reveal that during the period from October 1951 through October 1953 Mr. Crawford has responded on seventy three (73) different occasions to emergencies outside of regular working hours. The duration of time which he has been thusly employed vary *557 from thirty (30) minutes to five (5) hours. He has received no overtime payment for any of the services rendered as indicated.
(c) The body of a memorandum dated December 29, 1953, from the chief of the Bureau of Ships to the commander of the shipyard reads:
1. The.Bureau of Ships has reviewed the subject appeal as set forth in enclosure (1) and regrets the necessity of returning the case to the Shipyard for further action.
2. Mr. Crawford questions the legality of payroll deductions being made from his salary for the value of quarters and utility services furnished to him. It also appears that he is concerned with his failure to receive overtime compensation for special duty services performed outside of regular working hours in emergencies.
3. As indicated in reference (a) the Bureau considers that the Shipyard is correct in charging Mr. Crawford for quarters and services furnished to him. However, approval of the Shipyard’s practice of collecting such charges through payroll deductions was, apparently in error. Reference (b) provides that unless the furnishing of quarters, etc., is specifically authorized by the Schedule of Wages as an additional compensation or unless a deduction for such allowances is required by the Navy Comptroller Manual, any facilities furnished civilian employees must be paid for in cash by the employee and consequently will not appear on the payroll.
4. As regards Mr. Crawford’s entitlement to overtime pay for work performed outside regular working hours, the provisions of the War Overtime Pay Regulations, effective 1 May 1943, and subsequently, the Federal Employees Pay Act of 1945 provided for payment of overtime to graded employees.' It appears that Mr. Crawford was, under the provisions of these Acts, entitled to overtime compensation although serving in a special service.status. _ It is recognized that the Shipyard would, in all probability, not have records which could- substantiate a claim by Mr. Crawford for retroactive overtime compensation; however, the Bureau is of the opinion that Mr. Crawford should be informed on his right to file a claim with the General Accounting Office. It is possible that the “Logs” maintained by the Shipyard Fire Department in accordance with instructions con *558 tained in TT.S. Navy Structural Eire Fighting, OPNAV P 415-106 will contain information from which estimates may be made as to the hours of overtime work performed by Mr. Crawford for which he received no compensation.
5. The Bureau considers it desirable that action be taken to resolve these two matters. If, thereafter, Mr. Crawford desires that his complaint as to the inconsistency in the treatment accorded him, as an employee subject to the Classification Act as compared with that accorded ungraded employees, be forwarded to the Assistant Secretary of the Navy for Air the records should be completed and the case returned to the Bureau, Code 700.
11. (a) On January 18, 1954, plaintiff filed a claim with the General Accounting Office for the value of the quarters and utilities deducted from his salary, but expressly disclaimed any demand for overtime compensation.
(b) On February 9, 1954, plaintiff was advised by the commander of the shipyard that, commencing March 1,1954, deductions for quarters and utilities furnished plaintiff would no longer be withheld from his salary check, but that plaintiff would be required to pay for such facilities in cash; and that plaintiff could file a claim with the General Accounting Office for compensation for “special duty service outside of regular working hours in emergencies for which no compensation or other emoluments” were received. Plaintiff was requested to advise the commander of the shipyard by February 15, 1954, if he desired his appeal under the grievance procedure to be returned to the Assistant Secretary of the Navy for Air.
(c) On February 15,1954, plaintiff sent a memorandum to the commander of the shipyard in which plaintiff questioned the legality of the assessment for his quarters.
(d) On February 19, 1954, plaintiff was advised by the commander of the shipyard that the shipyard had no authority to make a local decision contrary to the instructions which the shipyard had received pertaining to charges for rents and utilities furnished plaintiff. Plaintiff was further advised that unless he notified the commander in writing on or before *559 February 26,1954, that he wished to have his grievance processed (on appeal), his case would be closed without further action.
(e) On February 26,1954, plaintiff advised the commander of the shipyard that he did not wish to waive any rights but wanted consideration by the commander (of certain legal arguments) before any further action was taken.
(f) Plaintiff did not pursue his appeal, and under date of April 2,1954, he was advised by the commander of the shipyard that his case was being closed without further action.
12. (a) Under date of April 26, 1954, there was sent to plaintiff from the Comptroller General of the United States a document entitled “Settlement Certificate,” the body of which reads:
Your claim for refund of the value of quarters and services furnished you while on special duty service subsequent to May 1,1943, the date on which your appointment was converted from a per diem to a per annum employee of the Department of the Navy, Charleston Naval Shipyard, United States Naval Base, Charleston, South Carolina, has been carefully examined and it is found that no part thereof may be allowed for the reasons hereinafter stated.
There is no authority for the furnishing of quarters in kind to Federal civilian personnel except as a part of compensation. If quarters are furnished as a part of compensation, the value must be deducted from the total rate of compensation paid for the employee’s position, pursuant to section 3 of the act of March 5,1928,45 Stat. 193. This section provides that the head of an executive department or independent establishment, where, in his judgment, conditions of employment require it, may continue to furnish civilians employed in the field service with quarters, heat, light, household equipment, subsistence, and laundry service; and appropriations for the fiscal year 1929 and thereafter of the character heretofore used for such purposes are hereby made available therefor provided that reasonable value of such allowances shall be determined and considered as part of the compensation in fixing the salary rate of such civilians.
In view of the provisions of the above statute and the personnel action dated May 1,1943, on file in this Office, *560 which fixed your salary rate at $3,200.00 per annum, the deductions which were made from your salary prior to March 1, 1943, as well as the payments which you were required to make therefor subsequent to March 1, 1954, are proper.
I therefore certify that no balance is found due you from the United States.
(b) A letter dated September 27, 1955, from the Comptroller General of the United States in response to a letter of July 28,1955, from a Congressman stated that the disallowance made on April 26,1954, of plaintiff’s claim was sustained. The letter from the Comptroller General concluded:
However, Mr. Crawford may have a claim, under the Federal Employees Pay Act of 1945, as amended, 5 U.S.C. 901 et seq., for additional compensation for overtime services actually rendered. The record discloses that he filed a claim for overtime services rendered in 1945 and 1946 which was allowed by a settlement of March 22, 1948, in the gross amount of $2,004.51. If Mr. Crawford is of the view that any additional sum is due him as overtime compensation for subsequent periods he is at liberty to file a claim for such amount.
13. (a) On August 13,1956, plaintiff filed a claim with the General Accounting Office for overtime compensation.
(b) On March 14, 1957, plaintiff voluntarily withdrew the above claim.
14. (a) On December 16,1958, plaintiff filed Ms petition in this court.
(b) On December 18, 1961, plaintiff submitted a claim to the General Accounting Office for the value of quarters and utilities deducted from his pay or, alternatively, for overtime compensation.
(c) The body of a letter (undated) to plaintiff from the Comptroller General of the United States reads:
Your claim for $6,333.28, representing 1,648 hours of overtime services rendered during the period November 10,1954 to August 11,1956, as the Fire Chief, Charleston Naval Shipyard, Charleston, South Carolina, is disallowed for the reasons stated below.
*561 Public Law 763, 68 Stat. 1111, 5 XJ.S.C. 926, amended the Federal Employees Pay Act of 1945, as amended, by adding a new section 401 which provided for premium compensation on an annual basis as a percentage of the minimum scheduled rate provided for grade GS-9 in the Classification Act of 1949, as amended, which percentage could not be in excess of 15 percent.
By letter dated November 16,1954, from the Fire Security Superintendent, it was provided, in effect, that you would normally be required to work five 8-hour days a week and continue on for 16 hours in a standby status after the 8 hours work period which fell on the day when neither of the assistant fire chiefs were on duty by reason of the regular 24-hour off duty period which occurred simultaneously each week. It was further provided that in no instance would you be scheduled to work a regular basic work week in excess of 40 hours requiring full time performance of actual work. Your aggregate rate for performing standby duty was directed to be in accordance with NCPI 85.4-5a(3) (a), which provided for a 15 percent premium rate, and subject to NCPI 85.4^5.g, or the Savings Clause of section 401 (b) of the Federal Employees Pay Act of 1945, as amended.
By Memorandum dated March 10, 1955, effective March 13, 1955, your standby day was changed from a fixed to a rotating day each week, however, you were still required to work the basic 40-hour week, Monday through Friday, for which you were paid base pay plus 15 percent premium. This memorandum further provided that the 15 percent covers all overtime regardless of the hours you might put in on an irregular basis as the result of emergencies or other reasons.
The foregoing tour of duty remained in effect until superseded by AdmiNdept INSTRUCTION 5330.2, addressed to you, dated December 21, 1955, which changed your work week to four 8-hour days and one 24-hour tour of duty (40 hours actual work and 16 hours standby), with the 24-hour tour of duty falling on the day when neither of the platoon supervisors were on duty, for the reasons previously stated. The Instruction further provided that your annual premium for standby duty was in accordance with NCPI 85.4-5.m, or 15 percent, and subject to the Savings Clause provision, as cited above. This work schedule appears to cover the balance of the period of your claim.
*562 In view of the above, it appears that you have been paid at the Saved Eate of pay plus the Premium overtime rate of 15 percent, as provided in the pertinent Navy Civilian Personnel Instructions, and that additional overtime, over and above your regular tour of duty including standby time was neither ordered nor approved. Accordingly, no additional amount is found due you for this portion of your claim.
With reference to your claim for the period prior to November 10, 1954, the Charleston Naval Shipyard has found that $52.43 is due you for the period January 12, 1947 to October 9, 1954. This amount represents overtime pay for all periods in excess of 15 minutes when you were required to be on duty during the time set aside for eating and sleeping. Settlement of this portion of your claim is being held in abeyance pending receipt of information from your attorneys, King and King, as to whether a settlement for such amount is or is not satisfactory.
(d) At the trial plaintiff stated that he seeks to recover either the value of quarters and allowances deducted from his salary or overtime compensation for services actually performed outside his workweek, but not both.
15. During the period involved in this suit (December 1, 1952 through February 28, 1954) there was deducted from plaintiff’s salary the amount of $1,062.34, representing the appraised value of quarters and utilities furnished to him by defendant during that period.
16. (a) Navy Civilian Personnel Instructions, Cover Sheet No. 277,1 June 1951, reads in part:
7-1. Special-Duty SeRvice.
a. Definition. — A. service separate and distinct from other services such as the Laborer, Helper and Mechanical Service, Maritime Service, Commissary Service, etc., as listed in NCPI250 and the schedules of wages for activities outside the United States, established by the Navy Department with the sanction of the Comptroller General (6 Comp. Gen. 594; A-16263 of 17 March 1927), in order to avoid conflict with the dual service statutes, for the purpose stated below.
b. Purpose. — At certain activities where the public interest requires the availability of particular employees *563 for fire and police protection and emergencies outside of regular working hours, the regular duties of the position held by each of such employees shall be considered as including the special services to be rendered outside of regular working hours in emergencies. Such employees, in the discretion of the commanding officer, may be assigned to the special-duty service and may be furnished quarters, heat, light, household equipment, subsistence, and laundry service, or any one or more of these if available. The application of NCPI 225.5-3g to employees in the special duty service is for determination of local command.
(b) Navy Civilian Personnel Instructions, Cover Sheet No. 439, 28 May 1953, reads in part:
3-4. Special Duty Sekvice. — Under normal conditions employees assigned to the special duty service shall not be required to perform duty outside of their scheduled workday or workweek. When necessary, special duty service employees may be employed in the regular duties of their ratings during hours outside their scheduled workday or workweek, and be compensated for such work in accordance with existing laws and regulations pertaining to overtime, the same as employees not assigned to the special duty service. If required to perform work within the regular duties of their ratings on holidays occurring within their basic 40-hour workweek, special duty service employees are entitled to holiday premium pay for such work. See NCPI225.
a. Value of facilities furnished. — Section 3 of the Act of 5 March 1928 (45 Stat. 193; 5 USC 75a) provides that the reasonable value of quarters, heat, light, household equipment, subsistence, and laundry service furnished employees assigned to special duty service shall be determined and considered as part of their compensation in fixing the salary rates of such employees. The Act applies to both graded and ungraded employees.
o. Basic compensation includes value of facilities furnished. — The value of quarters, subsistence, and other maintenance allowances furnished graded and ungraded employees assigned to special duty service is, under the Act of 5 March 1928, a part of their basic compensation. (Sec. 25.203, Civil Service Rules and Regulations.)
17. (a) The log books reflect that during the period involved in this suit, December 1, 1952 through February 28, *564 1954, plaintiff was engaged in the below indicated activities outside his regular workweek (40 hours straight time and 16 hours regularly scheduled overtime for which he had already been paid):

(b) During the period involved in this suit, the applicable overtime rate for plaintiff’s grade level was $1.55 per hour.
(c) Navy Civilian Personnel Instructions, Cover Sheet No. 489, 28 May 1953, reads in part:
*565 g. Minimum overtime period. — Periods of less than 15 minutes may be disregarded in computing overtime for pay and compensatory time off purposes.
CONCLUSION OF LAW
Upon tbe foregoing findings of fact, wbicb. are made a part of tbe judgment herein, tbe court .concludes as a matter of law tbat plaintiff is entitled to recover as to his alternative claim for overtime compensation and it is therefore adjudged and ordered tbat tbe plaintiff recover of and from tbe United States tbe sum of fourteen dollars and seventy-three cents ($14.73). It is further adjudged and ordered tbat plaintiff is not entitled to recover on bis claim for tbe value of quarters and utilities furnished to him by tbe defendant and as to this claim tbe petition is dismissed.

This fire occurred during regular duty hours (0800-1700). The 50 minutes listed represents that portion beyond regular duty hours.