Per Curiam :
This case was referred to Trial Commissioner Franklin M. Stone with directions to make findings of fact and recommendations for conclusions of law under the order of reference and 'Buie 134(h). The commissioner has done so in an opinion and report filed on May 26,1971. The defendant filed exceptions to the report and opinion. The parties have filed briefs and oral argument has been had. The court agrees with the commissioner’s findings, opinion and recommended conclusion of law, with the minor modifications in opinion and findings set forth below, and therefore adopts the same, as modified, as the basis for its judgment in this case.
The suit is for overtime compensation, as set forth by the commissioner. The plaintiffs were all employed as part of the 'General Services Administration uniformed guard force. The cgurt differs with the commissioner in that it holds that six of them, plaintiffs Bell, Dickens, Fitch, Harris, Hoover and Price must credit against compensable time one-half *335 hour for each day during which each was relieved of duty and allowed to eat lunch in the employees’ cafeteria or otherwise in the building guarded, subject only to infrequent recalls in instances of emergency. The modifications reflect this holding.
Before us defendant laid great stress on the Portal-to-Portal Act of 1947, 61 Stat. 84, as amended, 80 Stat. 844 (1966), 29 U.S.C. §§ 216, 251-262 (1970) which provided in pertinent part:
§ 254. Relief from certain future claims under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, and the Bacon-Davis Act.
(a) Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14,1947—
(1) walking, riding, or traveling to and from the actual place of (as enacted: “of” erroneously reads “or” in Code) performance of the principal activity or activities which such employee is employed to perform, and
(2) activities which are preliminary to or post-liminary to said principal activity or activities,
which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.
There were also provisions as to past claims, not here copied. §252.
This Act does not amend the Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1964), recodified 5 U.S.C. § 5542, under which this suit is brought. It applies to employees of private employers, not those of the United States. Defendant says, however, that it states the previous intent of Congress which must have been the same in both Acts, both being in pari materia.
The Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 *336 U.S.C. § 201 et seg. (1970), provided for mandatory overtime compensation in a wide variety of private industries engaged in commerce or activities affecting commerce. The drafters, apparently overlooking that there might be honest doubt as to what constituted compensable work, or when it began or ended, provided that an employer who violated the new law could be sued by employees for “liquidated damages” double the unpaid overtime, with no mitigation provided for in case of any good faith violation. There never was any provision that corresponded to this in the Federal Employees Pay Act, sufra,.
The older generation of lawyers will remember the consternation that ensued from Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), holding that notwithstanding any custom or practice to the contrary, time spent in traveling from the timeclock to the actual worksite prior to the beginning of the paid work time were “hours of work” within the meaning of the Fair Labor Standards Act. Defendant points to Congress’ prompt repudiation of that ruling in the Portal-to-Portal Act as showing that traveling time prior to reaching the actual worksite was not intended to be counted as “hours of work” within the meaning of the Federal Employees Pay Act of 1945 either.
This logic, if superficially appealing, is not compelling for two reasons.
First, when Congress acted in response to Anderson v. Mt. Clemens Pottery, it was aware of the existence of the Federal Employees Pay Act and that its language was almost exactly parallel to that of the Fair Labor Standards Act. Yet, Congress did not choose to include that Pay Act within the Portal-to-Portal exemptions. An exhaustive search of the extensive legislative history has failed to unearth even the slightest reference to Federal employees. It was believed that the misunderstanding of the law, as construed in Anderson v. Mt. Clemens Pottery, had been widespread and that millions would have claims still fresh enough not to be barred by limitations. Opponents and proponents of the bill 'alike repeatedly refer to the anticipated immense impact of Anderson on Government revenues through reduced tax revenue, and increased Government expenditures through *337 cost-plus-fixed-fee Government contracts, such as had been largely used in the immediately preceding World War II period. See, 93 Cong. Bee. A 834 (1947) (Bemarks of Bep. Lodge), 93 Cong. Bee. 4383 (1947) (House Conf. Bep.), 93 Cong. Bee. 2114-15 (1947) (Bemarks of Sen. Donnell), 93 Cong. Bee. 2294 (1947) (Bemarks of Sen. Cooper), 93 Cong. Bee. 2362 (1947) (Bemarks of Sen. Donnell). It was in fact asserted that the economic effect of the decision was to endanger the solvency of the Government. It could not have been alleged and was not, that the Federal Employees Pay Act would have results of that kind, however interpreted, lacking the magnifying power of a “liquidated damages” provision, and applying to fewer persons, who worked under a smaller variety of conditions.
Congress’ knowledge of a statute in pari materia applicable to Federal employees, and its failure to include that statute in its change, strongly suggests that Congress did not think a Portal-to-Portal Act was needed as to Federal employees’ rights under their separate statute. Thus, the Portal-to-Portal Act is not only not applicable, but is not relevant as to Federal employees.
Secondly, even if the Act were thought to be relevant in this case, the preliminary and postliminary activities involved here are so integral to the performance of the principal activity that the situs of these activities is the place of performance, and the principal activity for which the employee was employed to perform has begun. The activities involved were changing into uniforms, which were Government owned and could not be worn to or from the guard’s home, and picking up Government-owned firearms.
Here e'ach “Handbook For Guards” makes it abundantly clear that a presentable appearance is expected of each guard and that he is expected to stand inspection daily. Language like “A uniformed Guard * * * is a conspicuous figure. * * *. Therefore, his appearance * * * should be above reproach * * *” is indicative of the importance placed upon a guard’s appearance by his supervisors. These presentable-appearance-in-uniform and standing-of-inspection and being-armed requirements were so much in the interest of the employer that the guard’s performance of these functions were necessary to *338 and directly connected with their duties as guards. The Comptroller General, in 44 Comp. Gen. 195,197, has so ruled in a quite similar case:
Since it reasonably appears that the guards were notified to report early for roll call for the purpose of receiving specific assignments and instructions and for the purpose of drawing badges, weapons, etc., our opinion is that they are entitled to overtime compensation under the principle enunciated in Albright v. United States, 161 Ct. Cl. 356, and Baker v. United States, 161 Ct. Cl. 356 * * *
The Supreme Court, in Steiner v. Mitchell, 350 U.S. 247 (1956), held that workers in a wet storage battery plant, where the use of caustic and toxic materials was extensive, should be paid overtime wages for changing clothing and showering because such activities were within their “principal” rather than “preliminary” activities, within the meaning of the Portal-to-Portal Act. The Court concluded, 350 U.S. at 254, that the Congress intended the activities of changing clothing and showering to be within the protection of the Fair Labor Standards Act if such activities “are an integral part of and are essential to the principal activities of the employees.” As support for this conclusion the Court quoted a portion of the legislative history, 93 Cong. Pec. 2298 (1947) (Remarks of Sen. Cooper), the heart of which is:
* * *. In accordance with our intention as to the definition of ‘principal activity,’ if the employee could not perform his activity without putting on certain clothes, then the time used in changing into those clothes would be compensable as part of his principal activity. * * *
A final reference to the Federal Regulations should suffice to put this issue to rest. 29 C.F.R. § 790.7 (c) (1971 ed.) construes “walking, riding or traveling” time as follows:
(c) The statutory language and the legislative history indicate that the ‘walking, riding or traveling’ to which section 4(a) [§ 254(a)] refers is that which occurs, whether on or off the employer’s premises, in the course of an employee’s ordinary daily trips between his home or lodging and the actual place where he does what he is employed to do. It does not, however, include travel from the place of verformance of one principal *339 activity to the place of performance of another, nor does it include travel during the employee’s regular working hours. (Footnote omitted.) (Emphasis supplied.)
We conclude, therefore, that even in the course of diminishing the impact of the Fair Labor Standards Act, the Congress took care it should not be excluded from application to cases such as this, wherever it had previously been applicable. Thus the reference to the Portal-to-Portal Act avails the defendant nothing and instead reinforces the conclusions the commissioner reaches on other grounds.
OPINION OP COMMISSIONER
Stone, Commissioner: Plaintiffs were employed for all or a portion of the stipulated claim period (April 19, 1961 to February 28, 1966) as civilian guards on the General Services Administration (GSA) uniformed guard force, and served at various Government buildings or installations in and about Washington, D.C. All of the plaintiffs were classified Civil Service Employees under Grade GS-9. On April 19, 1967, plaintiffs filed a joint petition[1] seeking to recover overtime compensation pursuant to the provisions of the Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended,, 68 Stat. 1109 (1954), 5 TJ.S.C. § 911 (1964), *340 recodified 5 U.S.'C. § '5542 (1970), which reads in. pertinent part:
§ 911. Payment of overtime; rates.
All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed by officers and employees to whom this sub-chapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at the following rates:
(1) For each officer and employee whose basic compensation is at a rate which does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended, the overtime hourly rate of compensation shall be an amount equal to one and one-half times the hourly rate of basic compensation of such officer or employee, and all of such amount shall be considered premium compensation. [Emphasis supplied.]
As the basis for their claims, plaintiffs allege, in brief, that they were regularly ordered, required, and induced by their duly authorized superiors in the GSA to report for duty each workday substantial periods of time prior to the commencement of their respective regularly scheduled shifts of guard duty, and to remain on duty for more or less similar periods of time at the end of their shifts, in order to perform “functions” necessary to, and directly connected with, their jobs as guards. Plaintiffs have asserted more specifically that such functions consisted of changing into and out of Government-furnished uniforms at designated locker points; making themselves neat and otherwise presentable before reporting for duty; drawing and turning in weapons and other equipment at designated control points; proceeding to and from locker rooms, control points, and assigned guard posts; and receiving any special instructions from the guard being relieved. Plaintiffs contend that they necessarily performed the amounts of preshift and postshift overtime respectively claimed by them in order to comply with work rules and regulations relating to the aforestated functions, issued and enforced by GSA officials and superior officers who were duly authorized to order and approve overtime within the *341 meaning of Section 911 of the Federal Employees Pay Act of 1945, supra.
Defendant concedes that until the end of the claim period when the GSA guard force regulations were changed to permit members of the guard force to wear their unif orms home, they were required to spend some additional time on Government premises in order to change into and out of their uniforms. However, defendant admittedly has not paid plaintiffs for any of the overtime claimed by them, and presents three interrelated arguments in support of its position that they are not entitled to recover therefor: (1) that plaintiffs have failed to discharge their burden of proving that such time was compensable overtime “hours of work” which were “officially ordered or approved” within the meaning of the governing statute and implementing regulations; (2) that if plaintiffs did perform officially ordered or approved overtime, it must be offset by duty-free lunch and rest periods afforded them; and (3) that any overtime not fully offset in such a manner must be disregarded as de minimis. Plaintiffs generally deny that they were regularly relieved from duty and allowed, or took, substantial periods of free time for the purpose of eating lunch and resting; and therefore assert an offset would be inappropriate. Plaintiffs also argue since an offset of duty-free time is not proper, the amounts of overtime which they respectively performed were of such a substantial nature as to not come within the de mimrrds rule.
For reasons stated hereinafter, none of the plaintiffs who did not appear and testify are entitled to recover and those who did so are entitled to recover to the extent such recovery is not limited by offsets against compensable time as stated hereafter.
Exhaustive findings of fact are set forth, infra, and they will be summarized or repeated only to the extent necessary to provide a proper background for discussion of the issues raised by the parties.
Preliminary to outlining the pertinent facts, one matter relating to the prosecution of this case by plaintiffs and the evidence introduced herein by them should be briefly mentioned at this point. An average time required each workday *342 for tli© plaintiffs to comply with the guard force regulations and alleged work “orders” is not claimed by them. Rather, each of the plaintiffs who testified in this case claims entitlement to compensation for different amounts of preshift and postshift overtime 'assertedly necessarily performed by him. The difference in the amounts of overtime claimed by each plaintiff guard is largely attributable to the variations in the individual’s situation with respect to the location of his assigned locker, gun issue point, and duty post during the claim period. In view of the foregoing and other circumstances presented here, it was considered essential that each of the 47 plaintiffs still in this case should testify concerning his own individual situation in support of the claim advanced by him. Under the ground rules established for the conduct of the trial held herein, it was contemplated that each plaintiff would have to stand on, and be bound by, his own proof; that separate findings would be proposed and made as to each plaintiff with respect to the amount of time it necessarily took him to perform the various preshift and postshift activities required of him, and the total overtime, if any, he worked for which he was entitled to compensation; and that the petition would be dismissed as to all plaintiffs who did not appear and present testimony at the trial. Thirty-three plaintiffs testified, but the other 14 of them did not do so-. The findings requested by plaintiffs included separate ones with respect to each of the plaintiffs who testified but not as to the others. Defendant did not submit requested findings as to each plaintiff.
Subsequent to the trial, defendant, on May 1,1970, filed a motion to dismiss the petition as to the 14 plaintiffs who did not present testimony.[2] Plaintiffs did not file an objection or response of any kind to defendant’s said motion. By order of the court, entered on October 2,1970, defendant’s motion was “ [r] eferred to the -trial commissioner for his determination and decision in his report on the merits on the whole case.” *343 This matter will be dealt with in more detail and disposed of hereinafter.
The GSA is charged with the responsibility and duty of providing guard service for, and protecting, a number of buildings in and around Washington, D.C., which are occupied by various Federal agencies and personnel. The Administrator of GSA delegated such functions to the Public Buildings Service (PBS), which in turn established a uniformed civilian guard force originally organized into a “Protection Area” (PA), later redesignated the “Central Protection Force” (CPF). The CPF was under the overall supervision of the Chief of the Buildings Management Division (BMD), Region 3, General Services Administration, and had a chief (and two deputies) who was in charge of the day-to-day administration, operation, and deployment of members of the guard force.
The guard force was organized into three battalions divided into several companies with each company responsible for a certain group of buildings in Washington, D.C., and environs. Each company had a headquarters office in one of the buildings which the particular company was assigned to guard. Each scheduled work shift within the various companies operated under the immediate charge of a lieutenant who directly supervised the guard sergeants and privates on his shift. The guard lieutenant in turn was under the general supervision of a guard captain who approved the post assignments of the guards, assured that the officers and guards under his command received proper training and job instruction, maintained discipline and morals, and was generally charged with the supervision of all guard personnel assigned to his company.
Throughout the claim period, plaintiffs herein, as well as all other guards and the officers on the GSA Guard Force, operated under, and were required to obey and comply with, rules, regulations, and instructions contained in two booklets both entitled “Handbook for Guards.” These handbooks set forth detailed administrative and operating procedures governing the work activities of all GSA guards, which procedures were generally applicable to the guards assigned to the Central Protection Force in the District of Columbia *344 area. The particular handbook in effect at the beginning of the claim period was approved and issued on April 2,1952, by Mr. Charles A. Peters, Director, Public Buildings Service, Buildings Management Division. That handbook was subsequently revised and reissued on August 12, 1963. The latter issue continued in effect throughout the remainder of the claim period.[3] The 1952 handbook contains an opening statement by Mr. Peters which reads in part:
All members of the guard force must observe these regulations and instructions with full consciousness that they are literally the foundation of the guard force, and that as they are followed and obeyed, so will the efficiency and reputation of the guard force be established.
It would be impossible for a handbook to include instructions to cover all the situations which might arise in all locations. For this reason some of the instructions are quite general. Where the handbook is not specific as to how a case should be handled, detailed instructions are issued by the regional offices. It is the guard’s responsibility to find out from his supervisor, or some other responsible authority, just what the local instructions are. In all cases which have been covered by appropriate civil service or administrative regulations, they shall govern.
Paragraph 1 of Part I of the handbook issued in 1963 reads as follows:
1. APPLICABILITY. This handbook is the official GSA guard training text and shall be used as the basis for on-the-job, classroom, or follow-up programs developed in the regions. The regulations contained herein set forth the administrative and operating procedures governing the activities of all guards and guard supervisors. It shall be the duty of each guard to become familiar with and follow the rules and regulations prescribed in this handbook.
Pursuant to the regulations covering the subjects of Hours of Duty and Duty Schedules contained in both issues of the *345 Handbook for Guards, plaintiffs normally worked a 40-hour week consisting of five 8-hour tours or shifts during all periods involved in this case'. The hours of duty for each relief were normally scheduled from 12 p.m. to 8 a.m., 8 a.m. to 4 p.m., and 4 p.m. to 12 p.m. Under the regulations, the hours of duty for each relief could be prescribed otherwise and modified to meet the specific protection requirements of each facility. 3h this connection, it should be mentioned that the testimony indicates that at least some of the guard supervisory and officer personnel, including some of the plaintiffs, worked part of the time during the claim period on scheduled shifts which sometimes commenced and ended at times ranging from 15 minutes to 1 hour before the scheduled shifts of the guards who were just privates.
Subsection 206 of the 1952 Handbook appearing under the heading “Hours of duty” reads in part:
(B) Guards must report to their assigned posts in uniform, in time to relieve the guards whose tours of duty are just ending. Since guarding requires, around-the-clock service, a guard who is to be relieved by another must stay at his post until his relief arrives.
(C) Guard officers are expected to come on duty in sufficient time before their relief starts to inspect the guards of the relief, make any necessary reassignments of duty, and carry out special orders.
Section 216 of the same Handbook, captioned “Tardiness,” reads:
Guards must be ready to enter on duty promptly at the beginning of their shift. Tardiness, except that resulting from emergencies beyond their control, cannot be overlooked. Disciplinary action will be taken for unexcused tardiness.
Another directive addressed to “GSA GUARDS” was in the form of an unsigned document or memo issued by Region 3 of GSA dated April 20,1960. This apparently supplemented and emphasized some of the regulations set forth in the 1952 Handbook and reads in part:
HOURS ON DUTY — * * * Since guarding requires around-the-clock service, a Guard who is to be relieved by another must stay at his post until his relief arrives. He should report to his assigned post a few minutes early *346 in order to familiarize him [sic] with the Special Orders applicable to the post and receive from the Guard being relieved any special instructions that he may need to pass on.
There is no evidence that the above-quoted directive was ever specifically withdrawn or rescinded during the claim period.
Although the subjects of “HOURS OF DUTY” and “DUTY SCHEDULE” are covered in the 1963 revised Handbook, the pertinent paragraphs do not contain the language used in the 1952 Handbook relating to guards reporting to and remaining at their assigned posts, guard officers coming-on duty before their relief starts, or guards reporting to their assigned posts “a few minutes early” and remaining at their posts until relieved. However, from the testimony and evidence presented, the reporting practices continued under the 1963 Handbook in substantially the same manner as they did under the 1952 Handbook.
Sections 210 and 211 of the 1952 issue of the Handbook for Guards covers the subjects of overtime and night differential, respectively, and read in pertinent part:
Sec. 210. Overtime.• — If, because of an emergency or some other justifiable reason, a guard is required to work more than 40 hours in a week, he will be paid overtime. * * *
Sec. 211. Night differential. — For hours worked between 6 p.m. and 6 a.m. premium pay (10 percent), known as night differential, is paid in accordance with the Federal Employees’ Pay Act of 1945, as amended.
The 1963 revision of said Handbook does not contain a separate paragraph headed “Overtime,” but this subject matter is included in paragraph 51, which concerns emergency duty, reading in pertinent part:
51. EMERGENCY DUTY. Although the guard normally works certain regular hours, he may be called upon for emergency duties at times other than his regular duty hours. * * * Overtime payment or compensatory time off will be accorded if this emergency duty causes him to work in excess of 40 hours during any regular workweek.
All members of the guard force were furnished with uniforms, caps, badges, and certain other necessary equipment, *347 all of which items were Government property. Although the language of the regulations covering the wearing of uniforms contained in the 1952 and 1963 issues of the Handbook for Guards differs, it is undisputed that the effect of both versions was to require all guards to report to their assigned posts in the prescribed uniform, to wear the same during all duty hours, and to generally prohibit them from wearing their uniforms to and from work, or outside the limits of the official duty area, except in the performance of duties considered official in nature. No item of issue could be worn or carried away from the duty area. This prohibition of the guards wearing their uniforms outside the duty area continued in effect until the end of the claim period, when a new rule was instituted permitting the guards to wear their uniforms (without the badge and cap insignia) to and from work. The natural consequence of the uniform requirements in effect during the claim period was that the guards had to change into their uniforms before the beginning of their officially scheduled shifts and to remove them at the end of each shift before leaving the duty area.
Under the regulations contained in the guard handbooks, the guards were expected to always present a trim, neat, and orderly appearance while on duty, and, among other things, their shoes had to be shined, and all metal work be brightly polished. The same theme was emphasized in the document addressed to “GSA Guards” dated April 20,1960, mentioned earlier which states, among other things:
* * * A uniformed Guard * * * is a conspicuous figure. He attracts attention so much more than a person in ordinary civilian clothes. Therefore, his appearance * * * should be above reproach or the source of adverse criticism.
The Handbook for Guards required that guards be inspected before they assumed their posts to determine whether they were correctly dressed. Sometimes the guard supervisor would personally look over the guards in the guard office but at other times the guards stood inspection in their locker rooms. In either case, the supervisors would quickly check all the guards in uniform within a very short period of time.
GSA provided locker facilities for the guards and they *348 were required to use the same when changing into and out of their uniforms, and to store uniforms and equipment, civilian clothes, and other personal effects in their assigned lockers. Usually, the lockers provided for the use of the guards were installed in locker rooms located within the same building housing the company’s headquarters or guard office; but some lockers were located in other Government buildings situated in the surrounding area for which the company was responsible. In some cases, a guard was not assigned to duty in the same building where either his locker or company guard headquarters was located but was instead assigned to a post away from his assigned locker room. Each guard was required by Handbook regulations to keep his locker and the area around it neat, clean, and orderly at all times. Guard supervisors were required to make periodic inspections of all lockers in the presence of the guards.
While the evidence is unsatisfactory as to when a particular plaintiff guard shined his shoes, polished the metal work on his uniform, tidied up his locker, and stood inspections of his assigned locker, and there is no evidence showing the time necessarily and actually spent by him in such activities, it may be reasonably assumed that all plaintiff guards regularly complied with the regulations concerning these matters, either at the time they came to work or before leaving for the day, and that it took some time for them to do so.
Eevolvers were furnished to guards whose duties were such that a gun might be needed. Similar to the situation which existed with respect to the uniforms, under the regulations in both the 1952 and 1963 issues of the Handbook for Guards the guns could only be carried by the guards when they were actually on guard duty. In order to keep control over weapons, various gun “control” or “issuance” points were established and after changing into his uniform, a guard usually had to proceed to a designated control point and draw his gun before proceeding to his assigned post. Upon being relieved at the end of his shift, the guard had to return to the same gun point, and turn in his weapon before proceeding to his locker. However, some guards were allowed to exchange guns at their posts and obtained them directly from the *349 guards whom they were relieving, in which case the guard going on duty did not have to spend time proceeding from his locker to a gun point nor upon completion of his shift did he have to turn in his weapon at a gun point on the way back to his locker. The time it took for a guard to obtain or turn in a gun at a control point varied depending upon how many, if any, other guards were already waiting to check out or to turn in their guns. Thus, the waiting time varied from none, if a guard was first in line, to several minutes if he was in a long line.
The guards were required by the regulations in effect throughout the claim period to check guns issued to them at the gun control points or handed to them on post, and to advise the guard supervisor in the event a gun was considered unacceptable for any reason. However, with a few exceptions, plaintiffs did not claim nor offer proof that they spent a certain amount of time each day checking their guns; and the evidence does not show that as a general rule the guards ever gave their weapons more than a casual look after they were issued or turned over to them.
Plaintiffs have contended that they were required under the GSA regulations and directives to report to their posts early before the beginning of their scheduled shifts. Although there is no evidence that any of the plaintiff guard privates were specifically “ordered” in so many words to report to his assigned post “a few minutes early,” it is apparent from the April 20, 1960 general directive to “GSA GUARDS” mentioned hereinbefore that at least on one occasion each guard was instructed in writing that he “should” do so “in order to familiarize him [sic] with the Special Orders applicable to the post and receive from the Guard being relieved any special instructions that he may need to pass on.” The evidence does not show that the guards viewed the above directive as simply a statement of what their superiors considered a “desirable practice” which they would like to have the guards voluntarily follow as a matter of cooperation. On the contrary, while the evidence concerning the practice actually followed by the guards is quite limited, it appears that they reasonably understood and considered the instruction to be a command that obligated and required them to report to their *350 assigned -posts of duty a few minutes before tbe specified hour of their scheduled shifts. The practical effect and result of the instruction was that the guards were induced to report at their posts a little early and generally did so as a matter of normal routine. However, none of the plaintiff guards, with the exception of two who served as sergeants (and later as officers) during certain portions of their employment, presented specific testimony, or introduced any other evidence, as to the amount of time actually spent by them in complying with the “early reporting” directive. Furthermore, the statement is simply made in the separate findings requested as to each plaintiff who testified, except those who served in superior positions as sergeants and officers, to the effect that it took him a certain number of minutes to get to his post from his locker room, or from his gun point if he did not obtain his gun on post, and no amount of time was claimed for reporting to his post early. Accordingly, it is apparent that all but two plaintiffs have abandoned and waived their claims for overtime arising out of the early reporting directive in question.
Under the regulations in the 1952 Handbook for Guards, officers were “expected” to come on duty in sufficient time to “inspect” the guards of the relief, make necessary reassignments of duty, and carry out special orders. After the 1963 revision of the Handbook, the officers were still “expected” to come on duty sufficiently early to perform preshift functions. The testimony shows that the guard officers did not “voluntarily” report for duty early in order to perform their assigned preshift functions, but did so because they were required to do so by their superior officers and really had no choice in the matter. The plaintiffs who were sergeants (and later became officers) during certain portions of the claim period gave specific testimony with respect to the amounts of time required for “early reporting” in order for them to perform certain supervisory functions. Upon the basis of their testimony, only these two plaintiffs are entitled to claim overtime specifically for early reporting.
The credible testimony shows that the total time actually taken by a maj ority of the plaintiffs to perform required post-shift functions was less than the total time spent by them in *351 preshift activities. One of the reasons that accounts for this time difference is that plaintiff guard privates, as well as sergeants charged with supervisory duties, reported “a few minutes early/’ and that guard officers reported sufficiently early to enable them to perform their duties and responsibilities ; but since the claims for early reporting were not pursued in general, the time claimed and found to have been required for preshift and postshift activities is approximately the same.
Not only were guards more or less frequently rotated from post to post within the jurisdiction of the company to which they were assigned, but in some instances the shortage of guard personnel created an emergency situation which resulted in guards being temporarily assigned on loan from one company to another company within a particular battalion and even to a company in some other battalion. Consequently, the distances between the lockers, gun issue points, and various posts of duty varied a great deal. Even when a guard was assigned to duty in a building within his own company’s jurisdiction, oftentimes some distance existed between the lockers, the gun issue points, and the duty posts. Some of the gun issue points were located right in the locker rooms, others were located in the guard offices which were situated very nearby or some distance removed, on the same or different floors of the same building housing the lockers, or in other buildings. So, in some cases the distance between the lockers and gun issuance points was quite short, and in other instances the distances were very long. Sometimes, the distances involved in proceeding to a post, and/or inclement weather made it necessary, or more convenient or faster, for a guard to travel to and from his post either in his own personal motor vehicle or in a Government-owned vehicle. The time required for guards to travel between their lockers and posts varied depending upon the location involved.
During a part of the claim period, the actual practice generally followed by at least some members of the guard force was for the guard going on duty at a post to relieve the guard already there before the end of his shift so that *352 the off-going guard would be able to return to his gun point, or directly to Ms locker if he had transferred his gun to the relief guard, change clothes, and leave for home at or before the hour ending the shift. The practice of “early relief” has no real significance here because the total additional time the guards were at work would be spent before the beginning of the shift rather than divided between preshift and postshift activities. The additional time spent in excess of the 8-hour shift would be the same in either case.
Tn substance and brief summary, the evidence shows that in order for the members of the guard force, including the plaintiffs who testified in this case, to comply with directives, rules, and regulations relating to preshift and postshift procedures, each guard normally and generally on each workday had to go, prior to the beginning of his scheduled shift, first to his 'assigned locker where he changed into his uniform, made himself presentable for inspection, and sometimes stood inspection; then, unless he obtained his gun on post, he had to proceed to a designated gun control point, variously located in the locker room, in an area adjacent or near thereto, or at a point on another floor of the same building or another building ranging from a short to a long distance away from the locker room, where he drew and signed for his weapon, and in some cases other equipment, and, if he had not already done so, to stand inspection; then he had to either walk or ride to his assigned post of duty, where he felt compelled by GrSA directives 'and long standing custom or practice to report “a few minutes early,” and familiarize himself with any special orders applicable to the post and any special instructions the guard being relieved had to pass on, and, if he had not already drawn his gun, to accept and check the one transferred to him by the guard going off duty. Then, after the end of his scheduled shift, each guard had to follow, with some relatively minor deviations, substantially the same procedure in reverse.
Due to the differences in individual assignments of plaintiffs, their testimony understandably varied considerably with respect to the amount of time it took them to travel between their lockers, gun points, and assigned posts. How *353 ever, it is not so understandable and is liard to reconcile why there was much conflicting testimony as to the amount of time it took them to change clothes, make themselves presentable for inspection, and draw and return their weapons. The testimony presented by the 33 plaintiffs who appeared concerning the time it took them on the average to change into their uniforms, or in reverse from their uniforms into civilian clothes, ranged from a low of 5 minutes to a high of 20 minutes. With the exception of those guards who exchanged guns on post and did not claim any time for doing so, plaintiffs testified that it took from a low of 1 minute to a high of from “3 to 6 minutes” to draw their weapons or to turn them back in.
Upon consideration of the testimony of all the plaintiffs and witnesses, and after making allowances and adjustments in some time figures deemed incredible as being exaggerated and excessively high, it is found that the reasonable maximum average times required of the plaintiffs each workday to change from civilian clothes into their uniforms and make themselves presentable for duty after arriving at their lockers was 10 minutes; that 10 minutes were also required to change from their uniforms back into their civilian clothes; and that 3 minutes were required to draw their weapons and the same amount of time was required to turn them back in at the conclusion of the duty shift. Where weapons were merely exchanged on post, usually no time is specifically found and allowed, such time generally being included in that allowed each guard for travel between his locker and post. Also, with respect to the time allowed plaintiffs to change clothes, this time includes an allowance for performing miscellaneous duties such as maintaining their lockers in a neat and orderly condition and standing inspections.
Since under the ground rules of the trial each plaintiff necessarily stood on his own proof, those plaintiffs who testified that they required more than the reasonable maximum times established for them to change clothes or to draw and turn back in their guns have been allowed only the reasonable maximum, while those plaintiffs who testified that it required them less than the maximum logically are allowed only the *354 highest amount of time they testified it actually took them to perform these particular functions.[4]
Inasmuch as each plaintiff performed his duties under circumstances which varied from those of the other plaintiffs, separate findings have been made as to each plaintiff regarding the amounts of preshift and postshift overtime he was required to perform.[5]
Some members of the guard force complained about having to spend preshift and postshift overtime in performance of activities required under the regulations. These complaints were made orally to the sergeants and lieutenants who made the guard assignments, since the guards normally followed a chain of command and ordinarily would not go over the heads of their immediate superiors and directly complain to persons above the level of such supervisory personnel. The testimony suggests that if a guard continuously made complaints, efforts were made to replace him, and this fact undoubtedly served as a deterrent to the guards’ complaining since they understandably did not want to face possible discharge.
The present contention that plaintiffs were being required to perform overtime work apparently was first conveyed in writing to GSA by a letter dated February 25,1965, sent to the GSA Kegional Management Relations Officer, by Mr. J. P. Griner, National President, American Federation of Government Employees, Washington, D.O. In a letter to Mr. Griner dated April 8, 1965, the GSA Regional Administrator, Region 3, denied the guards’ claims for overtime on the principal basis that there existed only a “tacit expectation” *355 that the guards would report in sufficient time to reach their posts in uniform, at the commencement of their tours of duty. Quoting from Albright v. United States, 161 Ct. Cl. 356, 361 (1963), the letter stated, “a ‘tacit expectation’ is not equivalent to the statutory requirement of ‘official orders or approval.’ ” The GSA denial was also based upon the conclusion that the guards “are not required to report at any specific time in advance of their shifts but are merely required to be ready to assume their guard duties on time.” Subsequent to the denial of the claims by GSA, the guards filed claims with the General Accounting Office which also denied their claims.
In 1961, Mr. Charles C. Castella was appointed Chief, Buildings Management Division, GSA Region 3 (in which region the Government buildings involved herein were located) ; and he remained in that position until his retirement in August 1966. During the part of the claim period from April 19, 1961 to January 1965, Mr. Castella was the only person who was authorized to order and approve overtime for the members of the GSA Guard Force. From January 1965 to January 1966, Mr. Harold Kyle, Chief of the Protection Branch, in addition to Mr. Castella, could order and approve overtime. From January 1966 to the end of the claim period, i.e., February 28,1966, only Mr. Kyle, as Chief of the newly organized Protection Division, could authorize overtime. It is apparent from the foregoing that Mr. Castella was authorized to order and approve overtime during most of the claim period during which both the 1952 and the 1963 versions of the Handbook for Guards were in effect. Although defendant admitted that only Messrs. Castella and Kyle were the GSA officials authorized to order and approve overtime during the claim period, the testimony of Mr. Castella (Mr. Kyle was not called as a witness) shows that although guard captains generally were required to obtain prior approval from Mr. Castella or his office before they could authorize overtime for the guards under them, this requirement was quite liberally construed during the period from 1961 to 1965, and as a matter of actual practice there were times when overtime was performed by the guards under the direction of the guard captains, which overtime was subsequently ap *356 proved by Mm (Castella) or Ms office; however, beginning about 1965, the requirement that guard captains obtain advance approval from him prior to ordering guards to perform overtime work was more strictly enforced.
Mr. Castella was the top administrative official responsible for supervising all protection activities in Begion 3 until 1965, and while he did not personally directly participate in the operating activities of the guards, he had close administrative contacts daily with the Chief of the Protection Division in assuring that adequate guard service was being furnished. His testimony shows that he was generally familiar with the provisions and regulations contained in the Handbook for Guards; the responsibilities, duties, and daily procedures of the members of the guard force working in the Washington, D.C., Metropolitan area; and had a reasonable knowledge of the buildings in the area to which the guards were assigned to duty. He was aware that Mstorically the uniforms used by the guards were owned by the Government and kept in Government buildings where the guards were generally required under the regulations, until changed effective February 28,1966, to come in to work in time to put on their uniforms before reporting to their posts of duty, and to change back into civilian clothes after the end of their sMfts; that guards had to have a gun in their possession wMle on duty; that the weapons used by the guards could not be taken home by them and were closely controlled at points maintained at various places; that after getting into their uniforms, some guards had to travel from their lockers to gun points and draw a weapon and go on from there to duty posts before the beginning of their scheduled sMfts; that in some cases the guards were assigned to buildings so far away from their lockers and gun point that the Government furnished them transportation unless, as a matter of preference rather than a requirement, they drove to the duty posts in their own automobiles, which travel was performed prior to the beginning of the scheduled sMft; and that, logically, since posts had to be covered during the entire shift, the guards had to return to their gun posts and/or lockers to turn in their guns and change back into cirilian clothes after the end of their shifts.
*357 Although Mr. Castella denied that he knew how much time any of plaintiff guards spent in performing the aforestated actions, considering the extent of his knowledge of the pre-shift and postshift activities generally required of the guards by the regulations, it is concluded and found that he must have been aware of the fact that they were actually required each day to perform, and actually did perform, substantial amounts of overtime both prior to, and at the end of, their scheduled shifts. Certainly, a man occupying the high position held by Mr. Castella over such an extended period of time, with his obvious intelligence and admitted general knowledge of the entire operation of the guard force, could not reasonably assume that the time spent by the guards in performing these required activities was insignificant, or ade minimis” as contended by defendant.
I
Defendant states that there is considerable doubt that the “functions” and walking time for which plaintiffs claim compensation are in reality the type of “hours of work” referred to in the Federal Employees Pay Act of 1945, supra. There is no real basis for any such doubt expressed by defendant. The activities involved herein are essentially parallel to those present in Albright, supra, wherein this court held that the plaintiffs there were entitled to compensation for overtime spent in performing preshift activities consisting of drawing guns, receiving special instructions, and proceeding to posts of duty located varying distances from the guard house. Since the Pay Act provides for compensation for overtime “hours of work” officially ordered or approved, it is implicit in the holding in Albright that the court found that these activities constituted “hours of work.” It is concluded that the time spent by the plaintiffs here in performing the preshift and postshift activities in question was necessarily, primarily, and predominantly for their employer’s benefit. See, e.g., Detling v. United States, 193 Ct. Cl. 125, 432 F. 2d 462 (1970); Moss v. United States, 173 Ct. Cl. 1169, 353 F. 2d 746 (1965); Rapp v. United States, 167 Ct. Cl. 852, 340 F. 2d 635 (1964), in all of which cases the *358 court applied standards applicable to tlie instant case, established by the Supreme Court in Anderson v. Mt. Clements Pottery Co., 328 U.S. 680 (1946) (hereinafter referred to as Anderson I); Armour & Co. v. Wantock, 323 U.S. 126 (1944); and Skidmore v. Swift & Co., 323 U.S. 134 (1944). In light of the foregoing, it is held that the preshift and postshift activities performed by plaintiffs in this case constituted overtime “hours of work” within the meaning of the Pay Act.
II
Although some dispute exists as to the precise amounts of time each plaintiff spent in the performance of certain preshift and postshift activities, there is no real question that the practical effect of the guard force rules and regulations concerning the wearing of uniforms, drawing and returning weapons, and reporting to and remaining at assigned posts was to require plaintiffs to report early and to remain at work late; that they did perform some job-related functions both before and after their scheduled shifts; and that these activities took substantial periods of time in excess of the specified 8-hour tour of duty. The point of contention is whether time so spent constitutes compensable overtime, defined in section 911 of the Federal Employees Pay Act of 1945, sufra, as “[a]ll hours of work officially ordered or approved in excess of forty hours in any administrative workweek * * Consequently, if plaintiffs are to be entitled to recover compensation for the varying amounts of overtime it has been found that they spent in performance of their duties as guards, then theirs is the burden of satisfying the statutory standard that the overtime was “officially ordered or approved.”
Since this court has been called upon numerous times to interpret the statutory phrase “officially ordered or approved,” a fairly sizable body of case law has grown up around this narrow facet of civilian pay cases. Like so many instances in the law, it has become a matter of legal line drawing; i.e., in the context of the case at hand, are the facts in a particular case strong enough to constitute “official order or approval,” or have the facts as presented fallen *359 short of this line and therefore plaintiffs’ claim for compensation for overtime should be denied. Unfortunately, the line of demarcation is seldom clearly discernable.
In Albright, supra, the court held that civilian security guards employed by a naval shipyard were entitled to recover overtime compensation under section 911 of the Federal Employees Pay Act of 1945, supra, for the daily 15 minutes of overtime which was specifically ordered by written Security Office regulations. The regulation read:
12. Eeport to police headquarters fifteen minutes before going on duty.
While the court found that the plaintiffs there were entitled to overtime for the specifically required 15-minute period, it refused to allow recovery for an additional 5 minutes early reporting, since there was no official regulation but only a “tacit understanding” between the guards and the captains of the watch that they should be available for muster 20 minutes before duty. This case is important in that it illustrates the two extremes; that is, if there is a regulation specifically requiring overtime promulgated by a responsible official, then this constitutes “officially ordered or approved” but, at the other extreme, if there is only a “tacit expectation” that overtime is to be performed, this does not constitute official order or approval.
In between “tacit expectation” and a specific regulation requiring a certain number of minutes of overtime there exists a broad range of factual possibilities, which is best characterized as “more than a tacit expectation.” Where the facts show that there is more than only a “tacit expectation” that overtime be performed, such overtime has been found to be compensable as having been “officially ordered or approved,” even in the absence of a regulation specifically requiring a certain number of minutes of overtime. Where employees have been “induced” by their superiors to perform overtime in order to effectively complete their assignments and due to the nature of their employment, this overtime has been held to have been “officially ordered or approved” and therefore compensable. Anderson v. United States, 136 Ct. Cl. 365 (1956) (hereinafter referred to as Anderson II) *360 (Customs Border Patrol Inspectors); Adams v. United States, 162 Ct. Cl. 766 (1963) (Inspectors of the Border Patrol of the Immigration and Naturalization Service); Byrnes v. United States, 163 Ct. Cl. 167, 324 F. 2d 966 (1963), as amended, 330 F. 2d 986 (1964) (Investigators of the Internal Eevenue Service Alcohol and Tobacco Tax Division). In Raff v. United States, sufra, the court held that the performance of overtime by employees of the Civil Defense Administration was not voluntary but was “induced” by the employees’ reasonable and understandable fear that they would jeopardize their positions if they did not perform the additional after-hours duty. The court concluded that the “induced” duty officer tours were “officially ordered” and “approved” within the meaning of the Federal Employees Pay Act of 1945, supra.
In light of the foregoing, it seems readily apparent that plaintiffs have met their burden of proof by establishing that there was more than only a “tacit expectation” that they perform overtime. In the language of the cases, plaintiffs were “induced” to perform overtime. Even though there was no specific requirement that overtime be performed, the practical effect of guard force regulations achieved the same ends. To allow defendant to avoid payment of overtime compensation because it chose to require overtime indirectly rather than directly would obviously be inequitable. Overtime would be required in either case and therefore should be compensated for in either case.
Ill
As a prerequisite in this type of case, plaintiff has the burden of proving that the order or approval to perform overtime was issued by an official who had the authority to do so. Bowling v. United States, 181 Ct. Cl. 968 (1967); Bilello v. United States, 174 Ct. Cl. 1253 (1966); Albright, supra. The court in Bilello, supra, at 1257, boiled down the principles of several cases and stated:
The common denominator derived from these results is that a regulation requiring approval of overtime by a designated official before it can be paid is binding *361 on claimants unless the regulation is unreasonable or the official who has withheld formal written approval has nevertheless actively induced and encouraged the overtime.
On the basis of the facts and conclusions hereinbefore set forth, particularly those based upon the testimony of Mr. Castella, mentioned earlier, relating to his knowledge of the regulations covering the operations of the guard force, which were issued and enforced by duly authorized superiors of plaintiffs, and the activities required and performed by members of the force under such regulations, it is concluded that plaintiffs have successfully established that they performed substantial amounts of preshift and postshift overtime “hours of work” with the knowledge, encouragement, and/or inducement of properly authorized GSA officials.
Defendant argues that to allow plaintiffs to recover under the facts and circumstances present in this case would expand the holding of the court in Albright, supra, and set a precedent resulting in a chaotic situation for the Government because of the administrative impossibility of projecting the amount of pay to be earned by a particular employee. The Government made a similar argument in Anderson, 17, supra. This admittedly troublesome problem was laid to rest by this court when it stated, at p. 367:
* * * It may be that Congress would have been well advised to omit such employees from the Overtime Pay Act of 1945, or to make some different arrangement for their compensation. But Congress did not omit them, and their superiors were not authorized to deny to them the benefits of the act, on the ground that the administration of the act would be difficult, almost to the point of impossibility, or that money had not been provided to pay the employees what they were entitled to under the law.
IV
Defendant contends that throughout the entire claim period, plaintiffs were not only entitled under published GSA rules to a 30-minute paid lunch period and other rest periods each workday, but that the evidence shows that they actually received “at least” 30 minutes per shift of “duty free” time *362 during which they could eat lunch or otherwise rest. Therefore, while not seeking any affirmative money judgment against plaintiffs on the basis of such asserted duty free time, defendant argues that at least 30 minutes per day must be offset against any “officially ordered and approved” amounts of overtime work foun'd by the court to have been performed by plaintiffs. Defendant then goes on to argue that in the event the court should conclude that the duly authorized pre-shift and postshift overtime performed by plaintiffs exceeded in length the duty free periods of time mentioned above, such excess time should be disregarded under the de minimis rule.
Defendant’s position on this issue with respect to most of the plaintiffs is not supported by the evidence, case law cited by defendant, or sound logic.
Section 208 of the 1952 Handbook for Guards headed “Lunch periods” reads:
(A) Unlike most Government employees, whose work schedule includes an extra half hour to provide 30 minutes off for lunch on their own time, the guard’s lunch period is a part of his regular 8-hour tour of duty. A lunch period is granted him only as a privilege, and is available only when it does not interfere with his work. Although a 30-minute-lunch period is scheduled by the supervisor, and the guard is relieved of work during that time, he is officially on duty and subject to call.
(B) The guards in “one-man” buildings may have to eat lunch while working. In such oases the supervisor will try to regulate the patrol assignment so they can have a reasonable lunch period.
Paragraph 50 of the 1963 revision of the Handbook covering this same subject matter reads:
* * * A guard works a straight 8-hour tour of duty. He is authorized to eat his lunch during his tour of duty for a period not in excess of 30 minutes at a time to be determined by his supervisor. Lunch periods will be scheduled so as to least interfere with building protection requirements. During this lunch break the guard is officially on duty and subject to call.
It is clear that the above-quoted regulations do not prescribe a “duty free” lunch period nor guarantee the guards a lunch *363 period at any time. While the evidence shows that some guards had an opportunity to “rest” for varying periods at one time or another, neither the 1952 nor the 1963 Handbook for Guards contained specific rules covering the subject of rest periods.
General facts established by the evidence concerning lunch and rest periods, as well as interrelated matters such as duty assignments, patrols, and complaints, are set forth in the detailed findings, infra (finding 25), and specific facts covering the subject matter of workbreaks are included in the separate findings found as to each plaintiff. Accordingly, such facts will not be recited at length here. It is sufficient to say that the evidence shows that a number of the plaintiff guards were assigned to “one-man” buildings; that some of them were not subject to a “patrol assignment,” since they were not required to make patrols and were simply stationed at a fixed post in the building during their entire shift; that many of plaintiff guards brought their lunches to work with them; that a great majority of the plaintiffs either ate lunch, often on a piecemeal basis, “on the run” while making patrols or performing other 'assigned duties, or on the job at their duty posts during irregular and unscheduled periods when the opportunity presented itself while carrying out their work assignments, such as examining passes and signing persons in and out of the building, answering the telephone, reporting in to headquarters, checking trucks and other vehicles entering and leaving at gates and garages; that only a very few plaintiffs were consistently relieved and given, or took, regular lunch breaks of 30 minutes or any other lesser definite amount of time each workday, or other completely free time when they were not actually required to perform regular duties at their assigned posts; that all of the last-mentioned plaintiffs were considered to be officially on duty, and subject to call and interruption at all times during such breaks; and that most, if not all, guards were in fact interrupted on more or less frequent occasions while taking lunch or rest breaks.
It is apparent from the foregoing that an offset for the paid time allowed and taken by most of the plaintiffs for eating and resting clearly would be inappropriate, since their *364 individual situation closely parallels the factual standards set forth in Albright, supra, wherein the court stated, at p. 361:
* * * We do not think defendant is entitled to this offset. * * * most of the guards * * * ate on the job at their assigned posts. No definite time for meals was provided in the assignment schedules or otherwise in the regulations. * * *
In Bilello, supra, the court found a fact situation comparable to the one in Albright and the instant case. In Bilello, the regulations specified that the plaintiffs there were expected to eat at their duty post, no set times for meals were scheduled, plaintiffs were not allowed to leave the ship during duty hours except to go to the canteen on the dock, but the men assigned to a walking post were relieved and allowed to eat in the guard booth where they did not discharge work duties, although at rare times there were duty interruptions. The court concluded in an ultimate finding that under the aforestated facts, plaintiffs performed compensable services during their lunch breaks. However, since the court held that the preshift overtime performed had not been “ofiicially ordered or approved,” plaintiffs’ petition was dismissed, making it unnecessary for the court to reach the offset issue raised by defendant.
The situation with respect to the few guards here who were regularly relieved for lunch, albeit at irregular times, during which periods they did not perform scheduled duties, presents a more difficult but solvable problem. Since the 1963 Handbook for Guards plainly states “[djuring this lunch break the guard is officially on duty and subject to call,” it is hard to characterize this time as “off duty” or “duty free” as claimed by defendant. The guards who were relieved were not completely freed from their duties and responsibilities since they were subject to call and interruption. Yet it is clear that when employees are afforded a definite “duty free” lunch break of specified duration where they do nothing but eat and rest, such lunch break is offsettable. Bowling, supra. Moreover, the mere fact that an employee is required to eat lunch on the employer’s premises and to be on a duty status, subject to emergency call during such period, does not convert this private leisure time into compensable time. Bowling, *365 supra; Bantom v. United States, 165 Ct. Cl. 312, 321, cert. denied, 379 U.S. 890 (1964). And they do not constitute “hours of employment” within the intendment of the Act. Armstrong v. United States, 144 Ct. Cl. 659, 664, cert. denied, 361 U.S. 825 (1959).
Therefore, under the circumstances in this case, when the employer makes lunch break time available, and the employee actually takes advantage of such privilege, such time may offset otherwise compensable preshift or postshift hours of work. This is true even when such breaktime is not regularly scheduled so long as it is regularly taken; and it applies when the employee is nevertheless subject to emergency call unless he has shown that responding to such calls substantially reduced his duty free time.
Where applicable, such away-from-post lunch breaks will offset an equal amount of compensable overtime. Such offset will operate only in the cases where the employee was actually permitted to leave his post for his lunch break. In all other cases, eating lunch and the performance of regular duties are so intertwined so as to prohibit the finding that the “break” was the employee’s own and thus could operate as an offset.
V
Turning to defendant’s contention briefly mentioned here-inbefore, relating to the application of the de minimis rule, Anderson /, supra, is a leading case in which the Supreme Court discusses said rule in respect to the type of case at bar. There the Court stated, at pp. 692-93:
* * * It is only when an employee is required to give up a substantial measure of his tune and effort that compen-sable working time is involved. * * *
% sji :f: íJí H:
* * * [I]t is appropriate to apply a de minimis doctrine so that insubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek. [Emphasis supplied.]
As noted by defendant, the Court of Claims has recognized and applied the de minimis rule. For example, in Bantom, supra, the court held that 5 minutes should be disregarded as de minimis; and in Crawford v. United States, 169 Ct. Cl. *366 546, 564-65 (1965), tlie court upheld a Navy regulation providing that overtime periods of less than 15 minutes a day may be disregarded. Defendant cites Carter v. Panama Canal Co., 314 F. Supp. 386 (D.C. Cir. 1970), appeal docketed, No. 24,464, D.C. Cir., July 22, 1970, for the proposition that a time period up to 15 minutes is de minimis. According to the cases cited by defendant, a period of 20 minutes is the maximum a Federal court has found to be de minimis, McIntyre v. Joseph E. Seagram & Sons, 72 F. Supp. 366 (W.D. Ky. 1947).
The amounts of overtime found herein to have been spent on the average each workday by all of the plaintiffs (who testified) in the performance of preshift and postshift activities are considered to be substantial. Therefore, and since defendant's claim for “offset” is found to be without merit with respect to most plaintiffs, it is held that the de minimis rule is inapplicable and the overtime performed by the recovering plaintiffs may not be disregarded.
Furthermore, consistent with the Anderson I holding, discussed supra, when an employee has been found to have devoted a substantial measure of time and effort so as to qualify such time as compensable working time, an offset does not operate to render the remainder de minimis unless the net overtime after application of the offset is ten minutes or less per day.
VI
We return now to the motion filed by defendant to dismiss the petition as to the 14 plaintiffs who did not appear and present testimony, mentioned in the early part of this opinion. Although, as previously indicated, plaintiffs did not oppose said motion, they do so in their brief to the trial commissioner and urge that it be denied. Plaintiffs first correctly point out that pursuant to Eule 47 (c) (since September 1, 1969, Eule 131(c)), the parties, with the approval of the commissioner, agreed that the trial of this case would be limited to the issues of law and fact relating to the right of plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings. Plaintiffs then argue that the court has the benefit of the testimony *367 of a large majority of the plaintiffs, which assertedly shows that all of them were subject to the same overtime requirements that lie at the heart of this case and did, in fact, necessarily work overtime to comply with the agency’s work rules and regulations. Therefore, plaintiffs’ request that, on the issue of liability alone, all of the plaintiffs still in the case be bound by the court’s judgment on the basis of the evidence now in the record; and that, in the event the court should hold for plaintiffs on said issue, the amount of recovery due to plaintiffs who did not appear and testify be established in further proceedings.
Many of the material and relevant facts concerning the ground rules under which the trial of this case was held, and the plaintiffs who did not appear and testify, are set forth in a Preliminary Statement appearing immediately preceding the numbered findings of fact, infra. Said statement was incorporated by reference in finding 76, infra, and the facts contained in the statement supplement those found in findings 29(a), (b), and n. 4. In summary, the above-mentioned statement and findings show, in addition to the facts previously recited with respect to this subject matter, that this case was tried with the understanding on the part of counsel for both parties and the trial commissioner that the petition would be dismissed as to all plaintiffs who did not present testimony, unless defendant stipulated that their situation was essentially similar to that of the plaintiffs who had testified. Defendant never did so stipulate. In a letter dated March 12, 1970, sent to the attorneys for the parties prior to the last trial session held in this case, the commissioner reminded counsel of the above-mentioned and certain other understandings previously reached, and stated that plaintiffs “shall undertake to dismiss the petition herein as to any and all plaintiffs who have not testified by the time plaintiffs close proof and rest.”
Before the conclusion of the final trial session, plaintiffs’ attorney clearly indicated on the record that he had made every effort to communicate with all of the 14 plaintiffs who had not presented testimony and notify them that if they did not appear in court on March 26,1970, to testify in support of their overtime claims, the same would be dismissed by *368 the court; that he had sent a letter to each of these plaintiffs advising him to that effect, but that the letters mailed to six of them had been returned with the envelopes stamped “Address Unknown”; and that the other eight plaintiffs out of the 14 had either not responded to his letter or appeared to testify. Plaintiffs’ attorney stated that he had called all of the plaintiffs who would testify; that plaintiffs did not have any other evidence to offer; and that plaintiffs rested their case. After defendant’s attorney indicated that the Government was unwilling to stipulate that the 14 plaintiffs who had not testified were “similarly situated” as those who had testified, plaintiffs’ attorney made it plain that insofar as he was concerned these plaintiffs were “out of the case”; and that he and opposing counsel had arrived at a mutually satisfactory understanding in regard to the procedure under which defendant would file a motion that the petition be dismissed as to these particular plaintiffs, rather than plaintiffs taking the initiative with respect to such action as previously understood and agreed would be done.
In Paragraph 1 of defendant’s answer, it substantially admits the allegations in Paragraph 1 of plaintiffs’ petition in words which (for convenient reference) are quoted in pertinent part:
Admits that during all or part of the claim period, plaintiffs [including the plaintiffs who did not testify] were civilian guards employed by the General Services Administration, Washington, D.C.; that they were assigned guard duties at various Government buildings or installations located in or near Washington, D.C.; and that they are or were classified Civil Service employees of the United States. * * *
Considering the above-quoted portion of defendant’s answer, and all the evidence in the record, there can be no serious question but that all of the 14 plaintiffs who did not testify actually performed some amounts of overtime engaging in preshift, and postshift, activities similar to those which the plaintiffs who testified carried out. However, despite the foregoing, it should be noted and emphasized that there is no evidence in the record concerning the location of the *369 lockers, gun points, and posts of these 14 plaintiffs, nor any evidence showing the specific amounts of time spent by them in performing preshift and postshift activities. Accordingly, this record will not support findings that these 14 plaintiffs actually performed certain amounts of overtime.
Furthermore, as previously mentioned, the letters sent by plaintiffs’ attorney to six of these 14 plaintiffs were returned to the sender as undeliverable. It may be reasonably assumed that plaintiffs’ attorney sent the letters to these six plaintiffs at their last known addresses; and, therefore, it is apparent that none of them kept their attorney apprised of their current address or whereabouts. Since the letters sent by plaintiffs’ attorney to the other eight plaintiffs who failed to appear and testify apparently were not returned to the sender, it may be reasonably assumed that these letters were delivered to the addressees and that they simply ignored the same. In any event, the aforestated facts and circumstances indicate that all 14 of these plaintiffs have actually or constructively abandoned their claims; and it is found that they have failed to prosecute their claims and to discharge the burden of proving the same. Therefore, and further considering the ground rules under which this case was tried, it is concluded and found that the claims of the 14 plaintiffs who did not testify must be denied for want of prosecution and failure of proof, and that the petition as to them should be dismissed.
In summary, the plaintiffs who appeared and testified are entitled to be compensated for the overtime respectively performed by them as set forth in the separate findings of fact found herein relating to these plaintiffs, with the amount of recovery to be determined in further proceedings pursuant to Eule 131(c); but the plaintiffs who did not appear and testify are not so entitled.

 The petition included 50 plaintiffs but on June 9, 1969, the parties filed a stipulation dismissing, without prejudice, the claims of plaintiffs Lewis R. Dodds (8), J. Mills (32), and Leon White, Jr. (48). Pursuant to said stipulation and Rule 67 (since September 1, 1969, Rule 102), the petition was dismissed as to the three above-named plaintiffs. On November 3, 1970, an order was entered allowing a motion filed by plaintiffs to correct the caption of this case to reflect changes in the names of 13 plaintiffs who were incorrectly or incompletely identified in the petition. The 47 plaintiffs (correctly named) presently in the ease are: Eugie L. Baylor (1), Olden Bell (2), Hugh T. Brown (3), Joe Allen Brown (4), Moses Brooks, Jr. (5), william Byrd, Jr. (6), Shirley Dickens (7), Joseph O. Donley (9), Homer Ellison (10), Robert T. Eilertson (11), James R. Everett (12), Albert T. Pells (13), Raymond R. Pitch (14), Charles H. Pox (15), Harrison W. Gabnel (16), Robert I. Gardner (17), Albert E. Haas (18), Eugene Augustus Harris (19), waiter Haynes (20), Harold L. Harley (21), Herbert A. Hoff (22), Edward C. Holmes (23), Pearl E. Hoover (24), Abraham B. Hicks (25), Jay Archibald Jones (26), Brantley J. Kennerly (27), Willie Ralphus Lightfoot (28), Harvey C. Mangum (29), Willie Mayes (30), Martin S. Mitchell (31), Steve Henry Montgomery (33), Benjamin McCrady (34), Alexis T. Nogero (35), Edward T. Price (36), Leroy A. Perkins (37), Calvin H. Ray (38), Robert R. Reaves (39), Gordon P. Shaffer (40), WiUlam B. Shephard (41), Calvin Leroy Smith (42), William D. Tapscott (43), Melvin Lee Thomas (44), John W. Thurmond (45), Willie C. Watson (46), Henry P. Wiley (47), Edward Russell Wilson (49), Ulrich Victor Woodfork (50).

 These plaintiffs are: Hugh T. Brown (3), Joe Allen Brown (4), Moses Brooks, Jr. (5), Joseph O. Donley (9), Homer Ellison (10), Robert T. Eilcrtson (11), Albert T. Eells (13), Harrison W, Gabnel (16), Walter Haynes (20), Herbert A. Hoff (22), Martin S. Mitchell (31), Alexis T. Nogero (36), William B. Shephard (41), and Willie C. Watson (46).

 Although the language of the two handbooks relating to certain subject matters differs to some extent, the substance and effect thereof Is essentially the same; therefore, In the Interest of brevity and convenient reference, both handbooks will be referred to as the “Handbook for Guards” or the “Handbook,” unless it Is material and relevant to specify the particular version Involved.

 See n. 7 to finding 32(b) commenting on this action, and explaining that the maximum amount of time allowed, or the time a particular plaintiff testified it took him, as the case may be, to perform these functions is included in the separate finding made as to such plaintiff without further explanation in order to simplify the finding.

 See findings 38 to 65, inclusive. The primary basis for the individual findings was the testimony of the respective plaintiff. Therefore, to the extent the testimony of a plaintiff concerning the number of minutes he claimed it took him to perform preshift and postshift activities, including travel time, stood unrebutted and was considered credible, such amounts of time are allowed. Each of the separate findings includes a separate subpart which sets forth the facts concerning the individual situation of the particular plaintiff with respect to his eating while at work. Reference to these facts will be made in connection with the discussion of the offset issue involving the free time defendant assertedly allowed plaintiffs for lunch and rest, covered hereinafter.